**Marty PHILLIPS, Plaintiff,**

v.

**MICHIGAN DEPARTMENT OF CORRECTIONS, Robert Brown, Jr., Director, Darryl Opicka, D.O., R.C.F., Craig Hutchinson, M.D., Medical Director, R.C.F., Lynn A. Green, M.D., Deputy Medical Director, M.D.O.C., Defendants.**

No. G88–693 CA1.

United States District Court,
W.D. Michigan, S.D.

Jan. 26, 1990.

James H. Geary, Howard & Howard, Kalamazoo, Mich., for plaintiff.

A. Peter Govorchin, Asst. Atty. Gen., Frank J. Kelley, Atty. Gen., Corrections Div., Lansing, Mich., for defendants.

## OPINION

ENSLEN, District Judge.

This case is currently before the Court on plaintiff Marty Phillips' Motion for a Preliminary Injunction. Plaintiff is a prisoner at the Riverside Correctional Facility in Ionia, Michigan. Plaintiff filed a complaint in September 1988 pursuant to 42 U.S.C. § 1983 alleging that defendant Michigan Department of Corrections ("MDOC") has been deliberately indifferent to plaintiff's serious medical needs. The Court heard testimony in this case at a hearing which took place on December 11 and 12, 1989. Plaintiff stressed that she is asking this Court only for the opportunity to continue her estrogen treatment, at her own expense, if necessary. Plaintiff is not seeking sex reassignment treatment, nor is she complaining of special housing needs, bathroom or showering privileges.[1]

## BACKGROUND

### Life History

Plaintiff is an inmate at Riverside Correctional Facility, an all-male facility. The medical experts testifying in this case describe plaintiff as gender dysphoric, that is, plaintiff was born with male genitalia, yet anguishes over being a man. Indeed plaintiff asserts that she is a woman, a transsexual.[2] Plaintiff testified that although she was born with male physical characteristics, she is psychologically a female.

Before plaintiff's incarceration, she appeared and lived as a woman. Plaintiff adopted the name Lindsey Patricia Wofford, and lived with a man, Gradie Wofford, in a heterosexual relationship. Born Albert Hart, plaintiff has cross-dressed since she was fourteen years old, and lived

1. Plaintiff states that she has been treated well on the whole in the male facility. She states that the male inmates are used to her and no longer stare or make her uncomfortable. She is also able to use the bathroom and shower privately.

2. One issue in this matter is whether plaintiff is indeed a transsexual. Plaintiff's and defendant's experts agree that plaintiff is gender dysphoric, which is a fairly broad psychiatric term describing discomfort and rejection of one's

gender based on physical characteristics and sex assigned at birth. Within the classification of gender dysphoria, plaintiff's expert concludes that she is a transsexual while defendant's expert makes a related diagnosis, that of gender identity disorder of adulthood. The medical testimony and diagnoses will be discussed throughout this opinion. The Court, out of respect for plaintiff, will use female pronouns, as most parties in this proceeding have done.

as a woman since she was seventeen.[3] Now thirty four, plaintiff has had a number of surgeries and other procedures to enhance her appearance as a female, including electrolysis, a brow lift, dermabrasions, a chemical face peel, jaw reduction, a chin implant, and breast implant surgery. In addition, since the age of seventeen or eighteen, plaintiff has taken estrogen treatment to slow hair growth, soften skin, develop the breast implants, and further develop female characteristics.[4] Plaintiff retains male genitalia, and testified that she has not yet had castration surgery, because of the expense and because, in plaintiff's words, "before I had my last surgery, I wanted everything to be perfect."

After being arrested for the charge which led to her imprisonment, plaintiff used the name Marty Phillips. Plaintiff explained that she did this to save her family the embarrassment associated with a criminal trial. Plaintiff was charged with aiding and abetting an arson in which an individual died. At trial, plaintiff was convicted of first degree murder. That conviction was recently overturned by the Michigan Court of Appeals, and it is not yet clear whether the Michigan Supreme Court will hear the appeal. Thus it is possible that plaintiff will be released from prison in a few months.

When plaintiff was first incarcerated, plaintiff was placed in an all-male jail, and the Department of Corrections provided her estrogen treatment. Yet, after plaintiff was transferred to the correctional facility in Ionia, the hormonal treatments were stopped after plaintiff was examined by a MDOC physician, Dr. Opika. Plaintiff was also denied her requests for brassieres until recently when Dr. Opika's superior intervened. According to plaintiff, at the time Dr. Opika first examined her, he abruptly said that plaintiff was born a male and would stay a male as far as the MDOC was concerned.

One of the prison's policy directives affords prisoners limited access to health services outside the facility, at their own expense. Plaintiff has offered to pay for the estrogen therapy herself, and agreed to release the MDOC from claims arising from adverse complications of the estrogen treatment. Defendant MDOC has continued to deny plaintiff access to the treatment. As a result, plaintiff testified that she has suffered significant discomfort due to a reduction of tissue around her breasts which caused bruising. The lack of estrogen has also reversed many of the female characteristics previously attained through treatment and has caused periods of vomiting and depression.

*Medical Testimony*

During the two day hearing, the Court heard medical testimony from three physicians. Also, one medical expert was deposed and the transcript was provided to the Court. The following is a summary of the highlights of this medical and psychiatric evidence.

Dr. Darryl Opika, a general practitioner, originally examined plaintiff at Riverside Correctional Facility. He testified that he had no special expertise in diagnosis or treatment of transsexuals or gender dysphoric individuals. After Dr. Opika discovered that plaintiff still had testicles, he decided that there was no medical indication for estrogen. He also admitted that he denied plaintiff's request for a brassiere, stating that he did not "buy bras." Referring to plaintiff using masculine pronouns, Dr. Opika stated that plaintiff Phillips would not have his testicles removed while in the MDOC, and while in the Department of Corrections, he would remain in a male prison and "would be a male." Dr. Opika also testified that he had "no way of knowing whether plaintiff is or isn't a transsexual."

---

**3.** Over the past seventeen years, plaintiff has worked—among other things—as a cocktail waitress, a female impersonator, and a professional dancer.

**4.** According to plaintiff's testimony, eleven or twelve physicians in different locales have administered or prescribed estrogen for her during this time period. Estrogen, in plaintiff's case, also reduces the male genitalia significantly.

Dr. Robert Dickey, defendant's medical expert, is a staff psychiatrist at the Clarke Institute of Psychiatry in Toronto, Canada. Dr. Dickey is the psychiatrist in charge of the Gender Identity Clinic at the Clarke Institute, and has seen hundreds of patients through his work at the clinic in the past seven or eight years. Dr. Dickey examined plaintiff in one session recently at Ionia Correctional Facility.

According to Dr. Dickey, transsexualism is one of several types of gender dysphoria. *See* Defendant's Exhibit 3 (Diagnostic and Statistical Manual of Mental Disorders) at 71–78. Gender dysphoria, a disturbance in gender identity, is a psychiatric condition demonstrating no impairment of reality. *Id.* at 71. According to the Diagnostic and Statistical Manual of Mental Disorders ("DSM–III–R"), published by the American Psychiatric Association, the crux of the gender identity disorders is as follows:

> The essential feature of the [gender identity] disorders is an incongruence between assigned sex (*i.e.*, the sex that is recorded on the birth certificate) and gender identity. Gender identity is the sense of knowing to which sex one belongs, that is, the awareness that 'I am a male,' or 'I am a female.' Gender identity is the private experience of gender role, and gender role is the public expression of gender identity. Gender role can be defined as everything that one says and does to indicate to others or to one-

self the degree to which one is male or female.

Transsexualism, one of the gender identity disorders, is a severe disturbance.[5] The DSM–III–R, used by Dr. Dickey in his testimony, states as follows:

> Some forms of gender identity disturbance are on a continuum, whereas others may be discrete. When gender identity disturbance is mild, the person is aware that he is a male or female, but discomfort and a sense of inappropriateness about the assigned sex are experienced. When severe, *as in transsexualism*, the person not only is uncomfortable with the assigned sex but has the sense of belonging to the opposite sex.

*Id.* at 71. Dr. Dickey discussed transsexualism and another less severe gender identity disorder—known as gender identity disorder of adolescence or adulthood, nontranssexual type ("GIDAANT")—concluding that plaintiff Marty Phillips is properly diagnosed as having a GIDAANT. *See also* DSM–III–R § 302.85, at 76. Dr. Dickey decided that plaintiff is not a transsexual, because he questions plaintiff's conviction about acquiring new primary and secondary sex characteristics. According to Dr. Dickey's testimony, his clinic, consistent with the DSM–III–R diagnosis criteria, considers a transsexual as one who is unhappy with his or her anatomical sex and has had a persistent desire for two or more years for a change of primary and second-

---

**5.** A transsexual should be distinguished from homosexuals, who are sexually attracted to persons of the same sex, and from transvestites, who are most likely male heterosexuals who cross-dress for sexual arousal rather than comfort with gender identity. Both homosexuals and transvestites are "content with the sex into which they were born." *Meriwether v. Faulkner*, 821 F.2d 408, 412 n. 6 (7th Cir.1987); *Ulane v. Eastern Airlines, Inc.*, 742 F.2d 1081, 1083 n. 3 (7th Cir.1984); American Psychiatric Association, DSM–III–R § 302.50, at 74 (1987); Wise & Meyer, *Transvestism: Previous Findings and New Areas for Inquiry*, 6 J. Sex & Marital Therapy 116–120 (1980). A transsexual is also to be distinguished from a hermaphrodite, where an individual has both genital and sexual characteristics of both sexes. *Proof of Facts 3d: Tabor's Cyclopedic Medical Dictionary*, at 758 (15th ed. 1988).

In addition, the Court observes that:
> A transsexual believes that he is the victim of a biologic accident, cruelly imprisoned within a body incompatible with his real sexual identity. Most are men who consider themselves to have feminine gender identity and regard their genitalia and masculine features with repugnance. Their primary objective in seeking psychiatric help is not to obtain psychologic treatment but to secure surgery that will give them as close an approximation as possible to a female body.

Merck Manual of Diagnosis and Therapy 1437 (14th ed. 1982). *See generally* Comment, *The Law and Transsexualism: A Faltering Response to a Conceptual Dilemma*, 7 Conn.L.Rev. 288, 288 n. 1 (1975); Comment, *Transsexualism, Sex Reassignment Surgery, and the Law*, 56 Cornell L.Rev. 963, 963 n. 1 (1971).

ary sex characteristics. The DSM–III–R defines transsexualism as follows:

> The essential features of [transsexualism] are a persistent discomfort and sense of inappropriateness about one's assigned sex in a person who has reached puberty. In addition, there is persistent preoccupation, for at least two years, with getting rid of one's primary and secondary sex characteristics and acquiring the sex characteristics of the other sex. Therefore the diagnosis is not made if the disturbance is limited to brief periods of stress. Invariably there is the wish to live as a member of the other sex.... People with this disorder usually claim that they are uncomfortable wearing clothes of their assigned sex and therefore dress in clothes of the other sex. Often they engage in activities that in our culture tend to be associated with the other sex. These people often find their genitals repugnant, which may lead to persistent requests for sex reassignment by hormonal or surgical means. To various degrees, the behavior, dress, and mannerisms become those of the other sex.

*Id.* at 74. A transsexual demonstrates a consistent desire to change primary and secondary sex characteristics over a period of time and with an intensity Dr. Dickey feels plaintiff lacks.

On the other hand, Dr. Dickey stated that plaintiff falls into another gender dysphoric group, the GIDAANT class, which the DSM–III–R defines as follows:

> The essential features of this disorder are a persistent or recurrent discomfort and sense of inappropriateness about one's assigned sex, and persistent or recurrent cross-dressing in the role of the other sex, either in fantasy or in actuality, in a person who has reached puberty. This disorder differs from ... transsexualism in that there is no persistent preoc-

cupation (for at least two years) with getting rid of one's primary and secondary sex characteristics and acquiring the sex characteristics of the other sex.

*Id.* at 76.

Dr. Dickey also told the Court that at the Clarke Institute, the doctors do not treat a patient who desires a male to female sex change with estrogen or sexual reassignment surgery unless the individual has lived, worked, and otherwise existed as a woman for at least one year. For this determination, Dr. Dickey stated that he looks at formal name change to an unambiguously female name; work at an unambiguously female profession or one that is not associated with males or females; and other "real life" evidence of a desire to change sex.[6] Although this may seem harsh, said Dr. Dickey, the clinic has a real concern for performing treatment on an individual who may later have a change of heart about sexual identity.

This expert witness also testified on another relevant matter here—the medical risks of hormonal treatment. Dr. Dickey was of the opinion that the risks associated with estrogen treatment in a case as this one, especially with an individual with functioning testes, were significant, consisting of hypertension, stroke, and other negative side effects.

Dr. Alan Neal Wilson was deposed on November 1, 1989 and the Court was provided with a transcript of that proceeding. Dr. Wilson is a professor of surgery at Wayne State University's School of Medicine, specializing in plastic surgery. Dr. Wilson also has a private practice in the Detroit area. Dr. Wilson testified at length about his twenty years of experience with transsexual patients, and his work in surgical methods of treatment. According to Dr. Wilson, he has evaluated approximately 150 "male to female" transsexuals. The testimony revealed that Dr.

---

**6.** Dr. Dickey testified that he did not consider plaintiff to have passed the "real life" test, because she used an ambiguous (male-female) name; because there had been no formal name change; and because some of the work she did was in a male profession, *e.g.,* she worked as a female impersonator. Dr. Dickey also stated at one point that he could not say that "beyond a reasonable doubt", plaintiff's conviction about changing her sex was consistent with transsexualism. The Court observed at that time, and at the present, that such a standard need not be met for his diagnosis in this proceeding.

Wilson uses the DSM–III–R diagnosis for transsexualism as a starting point, supplementing that criteria with what he called the Armstrong four-factor test. Dr. Wilson described that test in the following way:

Sex is a very complex subject, and [C.H. Armstrong's] four criteria [for establishing transsexualism] are, one, chromosomal sex, that is the males have 46 chromosomes and an X and Y and a female has 46 and an X and X. The second criteria is gonadal sex. That is, whether the individual has testes or ovaries. The third criteria is apparent sex or the sex of appearance, genitalia and body form; and the fourth is psychological sex, and that's the way people behave. Normally they're all in congruence. If there's any difference, then the case is gender dysphoria, gender conflict or [in Armstrong's terminology] gender intersex.

[Armstrong] goes on to say that he considers a transsexual to be an individual who from usually five to seven years of age is convinced that he or she has the wrong physical body, and in such a person nothing has been found to dispel this conviction. And [Armstrong] quite rightly says that psychotherapy always fails.

Deposition of Wilson, at 14–15 (Nov. 1, 1989).

Dr. Wilson, after examining plaintiff, made a diagnosis of transsexualism. According to Dr. Wilson, gender transformation "depends on how much psychological conflict there is and how severe [the compulsion is]." *Id.* at 54. He described the transformation as "rather like stripping away years of social gender coding", a sort of "maturing process." *Id.* at 54–55. Dr. Wilson stressed plaintiff's need for hormone therapy, regardless of plans to do sex reassignment surgery. *Id.* at 29, 37, 60.

Dr. Wilson discussed the results of estrogen deprivation at this point in time, stating that it would have adverse effects, including psychological devastation, androgynization, and diminishing self-respect.[7]

This witness also gave testimony that conflicted with Dr. Dickey's conclusions about the risks of estrogen treatment in gender dysphoric individuals. According to Dr. Wilson, the treatment has few, if any, side effects especially in plaintiff's age group.[8]

The forth medical expert in this matter was Dr. Craig Hutchinson, the Director of the Bureau of Health Care for the MDOC. Since Dr. Hutchinson supervises a staff of physicians, including Dr. Opika, he had occasion to review plaintiff's case when a grievance was filed. Dr. Hutchinson has apparently been instrumental in making special accommodations for plaintiff, including bathroom and shower access and allowing her a brassiere. Dr. Hutchinson expressed a concern for both "a man who looks like a woman in a male prison", and, in a female prison, having an inmate who could "be the cause of a pregnancy." Dr. Hutchinson also confirmed that during plaintiff's initial incarceration—at Jackson—she received estrogen treatment. Although the MDOC has housed other transsexuals, including those who have taken medication, Dr. Hutchinson says that plaintiff's case is the first where the incarceration may be for life. Dr. Hutchinson revealed that the MDOC is concerned about the side effects of estrogen therapy, especially because plaintiff is also a smoker, and says that realistically, even if plaintiff signs a waiver for health complications, if plaintiff has a serious, debilitating reaction to the estrogen, the MDOC will in fact bear the financial burden.

**7.** This, of course, conflicts with defendant's witness' testimony that the result of estrogen withdrawal would have few psychological ramifications. Dr. Dickey did testify, however, that there would be a loss of a number of the feminine characteristics plaintiff had developed over the years, including lack of body hair, body fat distribution, breast tissue, and so forth. Plaintiff could also experience an increase in the size of the male genitalia and the frequency of erec-tions, which both diminish with the estrogen treatments. Dr. Dickey did not think there would be a shift in voice pitch.

**8.** According to Dr. Wilson, older patients may have increased risk of heart disease or stroke. Dr. Wilson testified that he has only seen one patient in twenty years in which these side effects might be attributed to estrogen.

## DISCUSSION

*Preliminary Injunction Standard*

In deciding whether to grant or deny a preliminary injunction, the Court must balance four well-known factors. These factors are:

1. Whether the plaintiff has shown a strong or substantial likelihood of success on the merits;

2. Whether the plaintiff has shown irreparable injury;

3. Whether the issuance of a preliminary injunction would cause substantial harm to others; and

4. Whether the public interest would be served by issuing a preliminary injunction. *Forry, Inc. v. Neundorfer, Inc.,* 837 F.2d 259, 262 (6th Cir.1988); *Mason County Medical Association v. Knebel,* 563 F.2d 256, 261 (6th Cir.1977).

The purpose of the preliminary injunction is to preserve the status quo pending final determination of the lawsuit. *University of Texas v. Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 1834, 68 L.Ed.2d 175 (1981). Preliminary injunctions are addressed to the discretion of the district court. *Synanon Foundation, Inc. v. California,* 444 U.S. 1307, 100 S.Ct. 496, 62 L.Ed.2d 454 (1979). This type of relief is an extraordinary remedy best used sparingly. *Roghan v. Block,* 590 F.Supp. 150 (W.D.Mich.1984).

■ The Sixth Circuit has cautioned courts that they should not view these factors as prerequisites to relief, but rather as factors to be balanced. *In re DeLorean Motor Co.,* 755 F.2d 1223 (6th Cir.1985). Thus, a court can enter a preliminary injunction if it finds that the plaintiff "at least shows serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant if an injunction is issued." *Friendship Materials, Inc. v. Michigan Brick, Inc.,* 679 F.2d 100, 105 (6th Cir. 1982). "Where the burden of the injunction would weigh as heavily on the defendant as on the plaintiff [, however], the plaintiff must make a showing of at least a 'strong probability of success on the merits' before a trial court would be justified in issuing the order." *Frisch's Restaurant, Inc. v. Shoney's, Inc.,* 759 F.2d 1261, 1270 (6th Cir.1985). Also, as the strength of showing as to irreparable harm increases, the necessity to show likelihood of success on the merits decreases. *Ardis v. Mansour,* 627 F.Supp. 641, 644 (W.D.Mich.1986). Yet in spite of the overall flexibility of the test for preliminary injunctive relief, the Sixth Circuit has stated that irreparable harm element is to be analyzed carefully. In *Friendship Materials, Inc. v. Michigan Brick, Inc.,* the court said:

> Despite the overall flexibility of the test for preliminary injunctive relief, and the discretion vested in the district court, equity has traditionally required [a showing of] irreparable harm before an interlocutory injunction may be issued.

679 F.2d 100, 103 (6th Cir.1982).

*Section 1983 Action*

■ The Eighth Amendment prohibits punishment that is physically barbarous or involves unnecessary and wanton infliction of pain. *Rhodes v. Chapman,* 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). The constitutional proscription against cruel and unusual punishment applies only after a criminal conviction. *Gilmore v. City of Atlanta,* 737 F.2d 894 (11th Cir.1984). Drafters of the Eighth Amendment were primarily concerned with preventing tortures and other barbarous methods of punishment, yet the Amendment has been used to halt punishment beyond the eighteenth century tortures. *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). The Amendment has continually been interpreted in a flexible and dynamic manner, drawing its meaning from the evolving standards of decency which mark the progress of a maturing society. *Id.; Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Thus no static test can exist by which courts can routinely determine whether conditions of confinement are cruel and unusual. *Rhodes v. Chapman,* 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). Of course, there need be no conscious purpose or intent to inflict suffering for defendants' conduct to violate

the Eighth Amendment. *U.S. ex rel. Schuster v. Vincent*, 524 F.2d 153 (2d Cir. 1975). The role of a federal court is to enforce the Eighth Amendment protection without assuming the role of jail administrator; this policy of minimal intrusion is of especial interest when a state prison system is involved. *Wilkerson v. Maggio*, 703 F.2d 909 (5th Cir.1983).

■■■ Deliberate indifference by prison officials to a prisoner's serious medical needs constitutes cruel and unusual punishment in violation of the Eighth Amendment. *Estelle*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251. The denial of such medical care—whether intentional or through deliberate indifference—in the worst case can result in physical torture, and even in less serious cases can result in pain without a penological purpose. *Id.* at 103, 97 S.Ct. at 290. Denial of medical care that results in unnecessary suffering in prison is inconsistent with contemporary standards of decency and gives rise to a cause of action under 42 U.S.C. § 1983. *Id.; White v. Farrier*, 849 F.2d 322 (8th Cir.1988). The Supreme Court has said that mere negligence in diagnosing or treating a medical condition does not rise to the level of an Eighth Amendment violation. *Estelle*, 429 U.S. at 106, 97 S.Ct. at 292.

■■■ Psychological disorders may constitute a serious medical need. *White v. Farrier*, 849 F.2d 322 (8th Cir.1988); *Meriwether v. Faulkner*, 821 F.2d 408 (7th Cir.), *cert. denied*, 484 U.S. 935, 108 S.Ct. 311, 98 L.Ed.2d 269 (1987). Thus the general principles and standards of the Eighth Amendment apply to the provision of mental health care. *Hoptowit v. Ray*, 682 F.2d 1237 (9th Cir.1982).

More specifically, transsexualism is not voluntarily assumed and is not merely a matter of sexual preference. *Sommers v. Budget Marketing, Inc.*, 667 F.2d 748 (8th Cir.1982). The Seventh and Eighth Circuits have concluded that transsexualism is a serious medical and psychological problem which constitutes a serious medical need. *White*, 849 F.2d at 325; *Meriwether*, 821 F.2d at 413. Several courts have held that transsexual inmates have a constitutional right to some type of medical treatment. *Supre v. Ricketts*, 792 F.2d 958 (10th Cir. 1986); *Meriwether*, 821 F.2d at 413; *Lamb v. Maschner*, 633 F.Supp. 351 (D.Kansas 1986). In *White*, the Eighth Circuit declared that there was a material issue of fact about whether the inmate in question was a transsexual and whether any treatment was required. 849 F.2d at 328.

In *Meriwether*, prison officials denied hormone therapy to an inmate who had been chemically castrated through nine years of estrogen therapy prior to incarceration. The Seventh Circuit recognized transsexualism as a serious medical need and held that a transsexual inmate was entitled to some type of medical treatment. The court held that a prisoner has no constitutional right to one particular type of treatment where another form of treatment is made available. 821 F.2d at 413. In *Meriwether*, the Seventh Circuit expressly stated that some form of treatment must be provided:

> [D]efendants have failed to provide the plaintiff with *any* type of medical treatment, not merely hormone therapy, for her gender dysphoria.... The Courts in *Supre* and *Lamb* both emphasized that a different result would be required in a case where there had been a total failure to provide any kind of medical attention at all.

821 F.2d at 414 (Emphasis supplied).

Similarly, in *Supre*, plaintiff attempted to mutilate his/her own sexual organs and requested estrogen therapy. Prison officials denied the request for estrogen because of the medical risks involved, but provided the inmate with psychological counseling. 792 F.2d 958. The district court in *Lamb* held that plaintiff had no right to be transferred to a female prison or to cosmetics, female clothing, preoperative hormone therapy, or sex reassignment surgery. None of the psychiatrists who had examined the plaintiff in *Lamb* recommended hormones or surgery. After deciding that plaintiff was receiving psychological treatment, the court granted defendant's motion for summary judgment. 633 F.Supp. at 353–54.

## CONCLUSION

For the purposes of this preliminary injunction motion, I believe that plaintiff has shown a strong likelihood of success on the merits. Under the facts before me on this motion, I find first that plaintiff suffers from a serious medical need, being deprived of treatment, whether the diagnosis is transsexualism or the gender identity disorder of adolescence or adulthood, nontranssexual type. The medical experts on gender agreed that Marty Phillips is gender dysphoric, and Dr. Dickey testified that transsexualism and GIDAANT were closely related disorders. The essence of both disorders result in a human who experiences distress about one of the most striking parts of our identity—whether we are male or female. The medical testimony was clear that transsexualism and GIDAANT are serious psychiatric disorders with profound emotional and physical effects. Moreover, one does not need to be a physician to see the effects of this disorder on Marty Phillips.[9]

Furthermore, read broadly, the case law supports the proposition that GIDAANT—as a form of gender dysphoria—may present a serious medical need under the *Estelle* formulation. The *Meriwether* court, for example, reasoned that, in general, a psychiatric or psychological condition may present a serious medical need. *See* 821 F.2d at 413 (citing *Partridge v. Two Unknown Police Officers of Houston,* 791 F.2d 1182, 1187 (5th Cir.1986); *Wellman v. Faulkner,* 715 F.2d 269, 273 (7th Cir.), *cert. denied,* 468 U.S. 1217, 104 S.Ct. 3587, 82 L.Ed.2d 885 (1983); *Ramos v. Lamm,* 639 F.2d 559, 574 (10th Cir.), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239

(1980); *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 763 (3d Cir.1979); *Bowring v. Godwin,* 551 F.2d 44, 47 (4th Cir.1977). Likewise, the cases make general and specific references to defendants failing to treat "gender dysphoria" and "transsexualism".

As to the second prong of this analysis, I find that defendant MDOC has denied Marty Phillips medical care through—at various times—both intentional conduct and deliberate indifference.[10] The denial of medical care in this case stems from at least three sources—which in concert violate plaintiff's right under the constitution to be free from cruel and unusual punishment.[11] A result decried in *Meriwether* and in dicta by the *Supre* and *Lamb* courts is present here: defendant has failed to provide plaintiff with treatment of any kind. And, as was the plaintiff in *Meriwether*, plaintiff has been the subject of ridicule and offensive remarks at the hands of Dr. Opika. Third, this Court characterizes defendant's conduct in this case as conduct which actually reversed the therapeutic effects of previous treatment. It is one thing to fail to provide an inmate with care that would improve his or her medical state, such as refusing to provide sex reassignment surgery or to operate on a long-endured cyst. Taking measures which actually reverse the effects of years of healing medical treatment, as I observe here, is measurably worse, making the cruel and unusual determination much easier.

The irreparable harm element is clear. Prior to trial, the effects of the lack of estrogen will wreak havoc on plaintiff's physical and emotional state. Such harm is neither compensable nor speculative.

---

9. I must admit, it is good for my concept of humanity to believe that all those who share this earth, if nothing more, would have empathy for Marty Phillips' attempt to heal herself. From the testimony, however, at least one medical professional had no such empathy.

10. I find that the conduct of Dr. Opika was to intentionally deny plaintiff the medical care she had received over a period of years prior to incarceration for her gender dysphoria. Others in the MDOC have been indifferent to the serious medical needs present in Marty Phillips' case.

11. As the Supreme Court has warned, the denial of medical care can result in physical torture or pain without a penological purpose. *Estelle v. Gamble,* 429 U.S. at 103, 97 S.Ct. at 290. Plaintiff here has suffered the effects of depression, vomiting and fainting spells, and pain as the tissue around her breasts has contracted and was bruised. More important, plaintiff has been made to experience the emotional pain she described when parts of her body reverted to looking and feeling characteristically male when plaintiff experiences life as a female.

Moreover, when an alleged deprivation of a constitutional right is involved, no further showing of irreparable harm is necessary. *See, e.g., Mitchell v. Cuomo,* 748 F.2d 804 (2d Cir.1984) (Eighth Amendment).

Finally, a preliminary injunction is unlikely to result in harm to others and I believe the public interest will be served by safeguarding Eighth Amendment rights in the prisons in Michigan. As defendant acknowledged in oral argument, this Court is bound by law to keep a balance between efficient prison management and keeping prisons a humane place: in this case, there is a glaring need for the latter goal. Therefore, for all the aforementioned reasons, I will grant plaintiff's motion for a preliminary injunction and I will order defendant MDOC, prior to the time of trial, to provide plaintiff with the same standard of care she was receiving prior to incarceration and at the time she was housed at Jackson Prison—2.5 mg per day of Premarin.