Merlin C. LONG, Plaintiff,

v.

Crispus C. NIX; Paul W. Grossheim; Sally Chandler Halford; Thomas Hundley; and Paul W. Loeffelholz, Defendants.

Civ. No. 4–93–CV–20025.

United States District Court,
S.D. Iowa,
Central Division.

Jan. 31, 1995.

**1360**

John Whiston, Sean McGrevey, and Farhan Younus, for plaintiff.

William Hill, Asst. Atty. Gen., for defendants.

## OPINION & JUDGMENT

BREMER, United States Magistrate Judge.

Plaintiff Merlin C. Long (Long) brings this civil rights action pursuant to 42 U.S.C. § 1983. Long is an inmate serving a life sentence at Iowa State Penitentiary (ISP). Plaintiff prefers to be addressed as Merlene and would like to be referred to as a female. However, to avoid confusion, the Court will refer to Long as a male. For example, it would be difficult to explain how *"she"* wishes to *crossdress* as a *woman*. Defendants are Iowa State Penitentiary (ISP) Warden Thomas Hundley; Crispus Nix, ISP's former warden; Sally Chandler Halford, the director of the Department of Corrections (DOC); Paul Grossheim, the former director of the DOC (now deceased); and Dr. Paul Loeffelholz, M.D., the DOC medical director.

Long alleges that defendants violated his Eighth Amendment right to be free from cruel and unusual punishment by refusing to provide appropriate living conditions and medical treatment. Long claims that defendants violated his Fourteenth Amendment due process rights by refusing to accommodate his gender identity disorder. Long seeks money damages and a declaratory judgment. Long also seeks injunctive relief requiring defendants to (1) provide adequate medical care for his gender identity problems, (2) place him in appropriate living conditions so that his right to privacy is protected, and (3) appropriately classify him. Defendants deny Long's claims and assert the defense of qualified immunity.

The parties consented to proceed before the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). The trial took place on October 27, 1994. Attorney John Whiston, with law student interns Sean McGrevey and Farhan Younus, represented Long. Assistant Attorney General William A. Hill represented defendants. Long filed his post-trial brief November 16, 1994. This matter is fully submitted.

## I. FINDINGS OF FACT

Merlin Long is a 61 year old man with a gender identity disorder.[1] He has crossdressed since an early age. In 1964, Merlin Long, who was convicted of first degree murder, began serving his life sentence at ISP.[2]

---

1. When he was a young child, Long thought he was a girl and that all girls had penises. Until Long turned 8 or 9 years old, his mother dressed him as a girl. Prior to age 9, Long wore his hair in a girls' style, and he wore only girls' clothes. When Long's family moved to Portland, Oregon, for the first time Long had to attend school as a boy.

Through his young adulthood, Long dressed for work as a man but changed into women's clothes when got home from work. Before being incarcerated, the longest period of time Long abstained from crossdressing was two weeks. Long described abstinence from crossdressing as painful.

2. A description of Long's crime is relevant due to his request to be housed in a women's prison. The murder is described in Long's appeal of a decision denying post-conviction relief:

[Long] met Bonnie Johnson at "Bud" Dennis's tavern. They later decided to go fishing.... The two [went fishing] ... [in] a secluded place....

Both had been drinking quite a bit, and ... [they] began fooling around with each other. He removed Bonnie's toreador pants and underpants[,] but at this point Bonnie acted as though she did not want to have intercourse. While Bonnie was sitting with her feet over the bank, [Long] struck her with an object along the right side of the head. He knocked Bonnie

Long reported to ISP in women's clothes and make-up (or in "full drag"), which the officials let him keep but not wear. Finally, ISP officials did allow Long to wear women's clothes. Long testified that he wore 3-inch fake fingernails, earrings, garter belts, hose, and teddies. He sometimes worked in the visitor's room dressed as a woman. Long claims to have realized that he was a woman at heart in 1965 or 1966.

In 1981, the ISP administration rescinded Long's privilege to wear women's clothing in response to a complaint by a parole board member. This occurred 17 years after the commencement of Long's sentence, and six months before a major riot resulting in significant changes in the operation of ISP. Since that time Long has worn standard male prisoner attire, which after the 1981 riot consists primarily of blue jeans and a blue work shirt. Long tries to "feminize" his features by plucking his eyebrows, lining his eyes with writing pencils, and by rouging his cheeks with chalk. Within ISP restrictions, Long tries to make his state-issued prison garments look feminine. Hundreds of times, Long has asked for and prison officials have denied, permission to receive and wear women's clothing and make-up. Long has repeatedly requested medical therapy and surgical sexual transformation. He claims to have entertained thoughts of self castration; however, he has not mutilated himself, nor has he been depressed to the point of attempting suicide.

Long wishes to receive hormone therapy. In 1981, Long first thought seriously about obtaining sex reassignment therapy or surgery and filed a civil action requesting a sex change. Long was aware that the surgery would involve removing his genitalia. The litigation was not pursued. In 1982, upon Long's request, officials transferred Long to a maximum security facility at the Missouri Department of Corrections where he says he was permitted to dress as a woman at all times. In 1986, Long returned to ISP where he has resided in protective custody and general population.

Defendants maintain that for security reasons they cannot accommodate Long's desire to wear women's clothing and undergarments. Acting Warden Hedgepeth testified at trial that permitting Long to crossdress would be contrary to prison policy, draw attention to Long's uniqueness, allow Long to broadcast his sexual availability, and invite sexual assault from other inmates. Defendants offered no testimony to indicate that Long has been sexually assaulted or harassed in the last ten years.[3] Long claims to have been celibate for approximately ten years due to fear of Acquired Immune Deficiency Syndrome (AIDS) transmission.

Long proposed some ideas at trial as to how defendants might accommodate his desire to crossdress: transfer him to a prison in a state such as Missouri, which allowed him to crossdress and reportedly houses gender dysphorics in their own wing; transfer him to the Iowa Women's Correctional Facility, which houses only women; or permit him to wear women's undergarments in his cell. Long argues that his crossdressing would not present any security problems. He points out that his preferred sexual identity is well-known throughout ISP and that, thus, there is not much more he could do to telegraph his "differentness" or sexual availability. Long stated at trial that he does not fear sexual attack by inmates as he is 61 years old.

The health care professionals who examined Long to diagnose his mental disorder differ as to treatment Long should receive. Dr. Walter O. Bockting, Ph.D. testified as plaintiff's expert; Dr. Paul W. Loeffelholz, M.D., Mr. Kazam Hassan, and Mr. Louis L.

out, then ripped off her brassiere and used it as a gag.... [He] tied her hands behind her back. After having tied the woman[,] he ... cut her breasts, stomach and hips and lastly cut her throat with his fishing knife. [Long] then attempted to have intercourse with her and thereafter dumped the body into the river. *Long v. Brewer*, 253 N.W.2d 549, 551 (Iowa 1977).

3. According to Long, both times he was raped while incarcerated, he was dressed as a woman. He testified that when he was 35 or 36 years of age, he was raped in a photo lab dark room while wearing a turtle neck, 6 inch heels, and tight jeans. At age 46 or 47, Long was raped while wearing 6 inch heels, black hose, and a silver dress.

Gustilo testified on behalf of defendants. Dr. Bockting, a licensed psychologist who works on the Program in Human Sexuality at the University of Minnesota Medical School Department of Family Practice and Community Health, specializes in the diagnosis and treatment of patients with gender identity disorders. Dr. Bockting examined and extensively tested Long in 1993. He found that Long's crossdressing has developed into intense gender dysphoria. Dr. Bockting suggests that Long needs treatment for despair resulting from his inability to crossdress and the obsessive-compulsive aspects of his personality. Dr. Bockting thinks that Long suffers from depression and anxiety; he believes that tranquilizers will relieve Long's depression.[4] Dr. Bockting recommends that in the event the tranquilizers prove ineffective, prison staff should provide Long limited opportunities to express his transgender identity and relieve stress through crossdressing and wearing make-up.

Dr. Bockting recognizes that Long's other emotional problems could interfere with effective treatment or relief for Long's gender identity disorder. Dr. Bockting's interpretation of Long's MMPI–2 psychological test results indicates that Long is "an individual who may be demanding, rebellious, hostile, aggressive, antisocial, impulsive, exhibitionistic, and promiscuous." Dr. Bockting reported that "[it] is likely that underneath all of this are deep feelings of insecurity and emotional withdrawal rooted in family of origin dysfunction." Dr. Bockting noted in his report that a person with Long's profile may be "highly resistant to psychological treatment."

Annual psychological evaluation reports by ISP staff indicate that Long has in fact been resistant to treatment. A report completed in 1990 shows that Long's interview was brief and unproductive. Long "presented himself in a verbally abusive and abrasive manner. He was hostile and belligerent. He answered no question in a direct manner. He

... asked why he should ... cooperate [with the evaluator]." Long indicated that he would not see the Parole Board that year. Long's 1991 Evaluation shows that while he was fairly congenial, direct, and open, he harbored negative feelings and attitudes toward the prison administration. He expressed the belief that due to his sexual identity administrative staff and prison officials harassed and discriminated against him. He stated that his attitude would "not change for the better until he is given what he deserves, [for example], transfer to minimum custody...."

In 1992, it was reported that while Long was scheduled to see the Parole Board for his annual review, he had no intention of keeping this commitment. In 1993, Long again indicated that he would not participate in a psychological interview for the Parole Board's purposes. The evaluator noted: "[d]ue to [Long's] unwillingness to participate in this interview, no meaningful psychological report is submitted." In 1994, Long declined to be interviewed for his annual psychological evaluation. Long explained that he is apprehensive about meeting with ISP staff members because they are unsympathetic and because he thinks it is unlikely that he will be paroled.

Dr. Bockting does not recommend hormone therapy or surgical transformation of Long's penis into a vagina. He provides in his evaluation:

> As far as hormonal or surgical sex reassignment ... Mr. Long currently does not meet the minimal requirements that would make him eligible.... The obsessive[-]compulsive features of his sexuality and his antisocial personality disorder would need to be adequately managed first.

Dr. Bockting testified that Long also suffers in part from paraphilia (a sexual attraction to "a particular object or subject that is unusu-

---

4. In his psychiatric evaluation, Dr. Bockting states that in his clinical experience in treating obsessive-compulsive features of crossdressing, gender dysphoria, and compulsive sexual behavior, he found "serotonergic medications such as Prozac, Zoloft, and Buspar and the neuroleptic Tegretol have proven extremely helpful...." Dr. Bockting recommends these medications "to improve [Long's] impulse control and [to] alleviate his despair."

al")[5] and transvestic fetishism ("a sexual arousal in response to wearing women's clothes"). However, he thinks Long suffers increasingly from gender identity disorder. The primary motivation for crossdressing distinguishes gender identity disorder[6] from a paraphilia or transvestic fetishism. When a person with gender identity disorder cross-dresses, it is a form of confident self-expression of female identity; when a person with a paraphilia or tranvestic fetish crossdresses, the main motivation is sexual arousal. Dr. Bockting stated that, based upon his analysis of test results, Long crossdresses both to express himself and for sexual stimulation. When asked his opinion regarding Long's primary motivation for crossdressing, Dr. Bockting stated that Long's reasons are "increasingly more an expression of female gender identity."

The ISP psychological staff has not recently administered psychological tests to Long. Dr. Loeffelholz based his diagnosis on a report by a doctor who diagnosed Long in 1964 as having a mere transvestic paraphilia. Dr. Loeffelholz has not personally examined Long recently; he last saw Long professionally over 13 years ago. Dr. Loeffelholz has reviewed Dr. Bockting's report and recommendations but likened the suggestion regarding a prescription for tranquilizers to "[an inmate's] grandmother calling him to ask for tranquilizers [for the inmate] because she takes them and feels that they would be appropriate for the inmate." At trial, Dr. Loeffelholz opined that Long's primary psychological problem is his serious antisocial and manipulative behavior. Dr. Loeffelholz thinks that Long's gender identity condition is secondary, and quite mild, in comparison to Long's other emotional problems.

In spite of Dr. Bockting's recommendation, the ISP medical staff has not prescribed tranquilizers for Long even though they are available on the prison's formulary. Dr. Loeffelholz testified that this was because Long has not specifically requested these tranquilizers from ISP staff. Dr. Loeffelholz stated that it is up to Long to make a request through the prison's Health Care Unit for an evaluation as to the appropriateness of a tranquilizer prescription. Dr. Loeffelholz admitted that he does not generally require psychiatric patients to identify their own problems and request a specific treatment plan. Long has refused to attend some of his regularly scheduled meetings with the staff psychologists. However, Long does use the Health Care Unit extensively for general physical problems.

## II.  CONCLUSIONS OF LAW

### A.  *Preclusion*

■ Defendants allege that this suit is barred under the principle of res judicata (claim preclusion) or collateral estoppel (issue preclusion). To establish claim preclusion, a party must provide (1) the identity of the previous cause of action; (2) the subject of the prior cause of action; (3) the parties to the prior cause of action; and (4) the quality or capacity of the person for or against whom the claim is made. *Tolefree v. City of Kansas City*, 980 F.2d 1171, 1175 (8th Cir.1992); *Goolsby v. Derby*, 189 N.W.2d 909, 914 (Iowa 1971) (" 'The doctrine of res judicata' is well established, and it may exist under two situations: (1) as a bar to a second action upon the cause of action, and (2) as a bar to relitigation of particular facts or issues in a different cause of action.... [I]n both instances, the parties ... must be identical or

5.  Dr. Bockting gave as examples of paraphilias the tendency to be sexually aroused by children, feet, neckties, or shoes.

6.  Gender identity disorders have been described as follows:

> The essential feature of the [gender identity] disorders is an incongruence between assigned sex (i.e., the sex that is recorded on the birth certificate) and gender identity. Gender identity is the sense of knowing to which sex one belongs, that is, the awareness that "I am a male," or "I am a female." Gender identity is the private experience of gender role, and gender role is the public expression of gender identity. Gender role can be defined as everything that one says and does to indicate to others or to oneself the degree to which one is male or female.

*Phillips v. Michigan Dept. of Corrections*, 731 F.Supp. 792, 795 (W.D.Mich.1990) (quoting Diagnostic and Statistical Manual of Mental Disorders ("DSM–III–R"), American Psychiatric Association 71 (3d ed. 1980)).

in privity...."). The doctrine of collateral estoppel provides that "'when an issue of ultimate fact has once been determined by a valid final judgment, that issue cannot again be litigated between the same parties in any future lawsuit.'" *U.S. v. Bailey*, 34 F.3d 683, 688 (8th Cir.1994) (quoting *Ashe v. Swenson*, 397 U.S. 436, 443, 90 S.Ct. 1189, 1194, 25 L.Ed.2d 469 (1970)); *State v. Butler*, 505 N.W.2d 806, 808 (Iowa 1993) *(quoting Ashe* ).

Defendants have not clearly established any of the elements required for claim preclusion. Defendants provide no citation to any previous litigation in which Long presented issues or claims (supposedly dismissed) identical to the ones before the Court. Defendants have not pinpointed any final determination on an issue of ultimate fact litigated by the present parties.

The parties raised the issue of preclusion in the Final Pretrial Order. The parties have neither discussed nor provided any support in fact or law for their contentions on this issue. The defendants have not established a record that demonstrates the elements required for claim or issue preclusion. Therefore, Defendants' Motion to Dismiss on the basis of preclusion is denied.

### B. *The Eighth Amendment*

■ The constitutional right of inmates to be free from cruel and unusual punishment is well established. The Supreme Court has held punishments which "'involve the unnecessary and wanton infliction of pain'" repugnant to the Eighth Amendment. *Rhodes v. Chapman*, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981); *Estelle v. Gamble*, 429 U.S. 97, 103–04, 97 S.Ct. 285, 290–91, 50 L.Ed.2d 251 (1976). The Eighth Amendment protects inmates from prison officials' "deliberate indifference to [their] serious medical needs." *Estelle*, 429 U.S. at 104, 97 S.Ct. at 291. Thus, the government must provide medical care for its prison inmates. *Id.* at 103, 97 S.Ct. at 290. Failure to treat an inmate's medical needs may produce un-

necessary pain and suffering prohibited by the Eighth Amendment. *Id.*

■ To prevail on an Eighth Amendment claim, an inmate must prove that (1) the deprivation was sufficiently serious and (2) the defendant officials acted with a sufficiently culpable state of mind. *Choate v. Lockhart*, 7 F.3d 1370, 1373 (8th Cir.1993). To be guilty of an Eighth Amendment violation a defendant must act with "deliberate indifference" to plaintiff's serious medical needs. *Estelle*, 429 U.S. at 104, 97 S.Ct. at 290. A "serious" medical need is one which (a) has been diagnosed by a physician as mandating treatment or (b) is so obvious that even a lay person would easily recognize the necessity for medical attention. *Johnson v. Busby*, 953 F.2d 349, 351 (8th Cir.1991).

■ Courts have expanded the reach of the Eighth Amendment to reflect society's evolving standards of decency. *White v. Farrier*, 849 F.2d 322, 325 (8th Cir.1988). Thus, psychological disorders may rise to the level of serious medical need. *White*, 849 F.2d at 325; *Meriwether v. Faulkner*, 821 F.2d 408, 413 (7th Cir.1987), *cert. denied*, 484 U.S. 935, 108 S.Ct. 311, 98 L.Ed.2d 269 (1987); *see Young v. Armontrout*, 795 F.2d 55, 56 (8th Cir.1986). The Seventh and Eighth Circuits have recognized transsexualism as a serious medical need that should be treated the same as any other psychiatric disorder. *See White*, 849 F.2d at 325; *Meriwether*, 821 F.2d at 413. Transsexualism is a serious psychiatric disorder described as:

a condition that exists when a physiologically normal person ... experiences discomfort or discontent about nature's choice of his or her sex. This discomfort is generally accompanied by a desire to utilize hormonal, surgical, and civil procedures to allow the individual to live in his or her preferred sex role. The diagnosis is appropriate only if the discomfort has been continuous for at least two years and is not due to another mental disorder.[7]

---

7. One does not voluntarily assume transsexualism as a way of life. *Meriwether*, 821 F.2d at 412. Transsexualism is not a matter of sexual preference. *Id.; see Phillips v. Michigan Dept. of Corrections*, 731 F.Supp. 792, 795 n. 5

(W.D.Mich.1990) (noting that "[a] transsexual should be distinguished from homosexuals, who are sexually attracted to persons of the same sex, and from transvestites who are most likely to be male heterosexuals who cross-dress for sexual

*Meriwether,* 821 F.2d at 412 (citing American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM–III–R"), § 302.5x (3d ed. 1980)).

While transsexual inmates have no constitutional right to any particular type of treatment (i.e., surgery or estrogen therapy), they are entitled to some type of medical treatment. *Meriwether,* 821 F.2d at 413; *see generally White,* 849 F.2d at 327 (recognizing other courts' holdings that inmates are not constitutionally entitled to hormone therapy); *Supre v. Ricketts,* 792 F.2d 958 (10th Cir. 1986); *Tiller v. Owens,* 719 F.Supp. 1256, 1308 (W.D.Penn.1989) ("Although a prisoner has a right to some kind of medical treatment, he does not have a right to any particular type of therapy, provided that a therapy option is available."); *Lamb v. Maschner,* 633 F.Supp. 351 (Kansas 1986).

■ This court holds that the extent of Long's gender identity disorder does not constitute a serious medical need for which treatment is mandated. *See Johnson,* 953 F.2d at 351. Long's gender identity problems are secondary to his other psychological problems. In addition to expert testimony, the Court considers several other factors: whether any of the psychiatrists or psychologists on Long's case recommend the treatment Long seeks; whether Long had a history of nonconformity; and whether Long has received any treatment for mental health that would be inconsistent with the diagnosis of transsexualism. *See White,* 849 F.2d at

328 (citing *Lamb,* 633 F.Supp. 351 (D.Kan. 1986)).

The Court gives Dr. Loeffelholz's analysis limited weight in its decision because of his failure to recently examine or test Long. Dr. Loeffelholz has little education, training, and experience in the area of gender identity disorders, especially compared to that of Dr. Bockting. Dr. Bockting has published at least 7 articles or books and has given at least 35 presentations on transgender issues. He also teaches medical students, residents in family practice, and psychiatry students in the area of gender dysphoria.

Dr. Bockting, Long's own expert, did not diagnose Long as being a transsexual but as having "gender identity disorder not otherwise specified." Rather than being a transsexual with characteristic persistent discomfort, a sense of inappropriateness about his assigned sex, and *persistent* preoccupation with getting rid of his primary and secondary sex characteristics for at least two years, at best Long can be described as a male who prefers to crossdress for both gender identity expression as well as for sexual stimulation. Long claims to have entertained the thought of surgical removal of his genitalia, but he presented no evidence at trial that he is preoccupied with this thought. Long refuses therapy from the ISP staff. It is not clear that a tranquilizer prescription would be effective, particularly in light of his other significant psychiatric problems. Additionally, Long has not met the "real-life" test of living as a woman continuously for several years. *White,* 849 F.2d at 326; *see Meri-*

---

arousal rather than comfort with gender identity. Both homosexuals and transvestites are 'content with the sex into which they were born.' ") (quoting *Meriwether,* 821 F.2d at 412 n. 6). Transsexualism, a gender identity disorder, is a severe disturbance. *Phillips,* 731 F.Supp. at 795–96 ("When gender identity disturbance is mild, the person is aware that he is a male or female, but discomfort and a sense of inappropriateness about the assigned sex are experienced. When severe, as in transsexualism, the person not only is uncomfortable with the assigned sex but has the sense of belonging to the opposite sex.").

The American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders ("DSM–III–R") defines transsexualism as follows:

The essential features of [transsexualism] are a persistent discomfort and sense of inappropri-

ateness about one's assigned sex in a person who has reached puberty.... [T]here is persistent preoccupation, for at least two years, with getting rid of one's primary and secondary sex characteristics and acquiring the sex characteristics of the other sex. Therefore the diagnosis is not made if the disturbance is limited to brief periods of stress. Invariably there is the wish to live as a member of the other sex.... People with this disorder usually claim that they are uncomfortable wearing clothes of their assigned sex and therefore dress in clothes of the other sex.... These people often find their genitals repugnant, which may lead to persistent requests for sex reassignment by hormonal or surgical means. *Id.* at 796 (quoting American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders § 302.85, at 74 (3d ed. 1980)).

*wether*, 821 F.2d at 413 (holding that plaintiff stated a valid Eighth Amendment claim that, if proven, would entitle "her" to medical treatment where plaintiff was transsexual; chemically castrated due to years of estrogen therapy; underwent surgical augmentation of facial structure and body shape in order to resemble a female; and had been living as a female since the age of 14); *Phillips*, 731 F.Supp. 792 (W.D.Mich.1990) (granting preliminary injunction ordering correctional officials to provide plaintiff with estrogen therapy where plaintiff was a transsexual; crossdressed, lived as a woman, and received estrogen treatment since she was 17; underwent several surgeries and procedures to enhance her feminine appearance; and defendants' failure to provide any medical treatment actually reversed the therapeutic effects of years of healing estrogen treatment); *see also Lamb*, 633 F.Supp. at 353–54 (holding that plaintiff had no right to makeup, women's clothes, hormone therapy, sex reassignment procedure, or a transfer to a women's prison where none of the psychiatrists who examined plaintiff recommended hormones or surgery and psychological treatment was provided).

The fact that Dr. Bockting recommended that Long be given a prescription of tranquilizers is not a sufficient basis to find that Long suffers from a serious medical need. Dr. Bockting did not diagnose Long as *mandating* treatment. *See Johnson*, 953 F.2d at 351. In essence, Long demands the privilege of crossdressing so that he can exist in the prison on his own terms, rather than in conformity with prison regulations. Dr. Bockting suggests that medication may alleviate Long's anxiety and obsessive-compulsive features of his personality. The Court finds that this anxiety is not a serious medical need.

Even if Long did have a serious medical need, defendants were not deliberately indifferent to it. Physicians are entitled to exercise their professional judgment in making medical decisions. *Taylor v. Turner*, 884 F.2d 1088, 1090 (8th Cir.1989). An inmate's disagreement with the course of medical treatment defendants provide him is an insufficient basis for an eighth amendment vio-

lation. *Kayser v. Caspari*, 16 F.3d 280, 281 (8th Cir.1994); *Davis v. Hall*, 992 F.2d 151, 153 (8th Cir.1993) (citing *Smith v. Marcantonio*, 910 F.2d 500, 502 (8th Cir.1990)); *White v. Farrier*, 849 F.2d 322, 327 (8th Cir.1988). Mere negligence or inadvertence is insufficient to satisfy the eighth amendment deliberate indifference standard. *See Estelle*, 429 U.S. at 105, 97 S.Ct. at 291–92 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid [Eighth Amendment] claim.... Medical malpractice [is not] a constitutional violation."); *Choate*, 7 F.3d at 1374. Loeffelholz did not act with deliberate indifference to Long's allegedly serious medical need merely because he denied Long medication recommended by Dr. Bockting.

The prison wardens and the DOC director were justified in relying on the opinions of medical staff in their determination that Long's requests to crossdress should not be granted, particularly in light of the conflicting diagnosis and Long's refusal to participate in evaluation or therapy with ISP psychologists. *Crooks v. Nix*, 872 F.2d 800, 803 (8th Cir.1989).

Since Long has not established the Eighth Amendment threshold requirement of serious medical need, Long's request for relief as to his Eighth Amendment claim is denied.

### C. *The Fourteenth Amendment*

Long claims that defendants violated his Fourteenth Amendment due process rights by requiring him to live in a men's prison despite his preferred gender identity as a female. He claims that defendants violated his rights by failing to provide him with adequate living conditions and meaningful medical treatment.

The Fourteenth Amendment due process clause provides that the State shall not deprive any person of life, liberty, or property without due process of law. *See Daniels v. Williams*, 474 U.S. 327, 331, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986). Courts have historically applied this guarantee of due process to deliberate decisions of government officials to deprive a person of life, liberty, or property. *Id.*

■ An inmate has no constitutional right to a particular prison classification or status.

*Moody v. Daggett,* 429 U.S. 78, 88, 97 S.Ct. 274, 279, 50 L.Ed.2d 236 (1976) (discussing *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), where the Supreme Court found that a state prisoner was not entitled to due process protections upon the discretionary transfer to a substantially less agreeable prison even where the transfer resulted in "grievous loss" to the inmate); *see Hewitt v. Helms,* 459 U.S. 460, 466–67, 103 S.Ct. 864, 868–69, 74 L.Ed.2d 675 (1983) (noting that the due process clause does not implicitly create an interest in being confined to a general population facility rather than administrative segregation quarters); *Ervin v. Busby,* 992 F.2d 147, 149–50 (8th Cir.1983) (citing *Meachum,* 427 U.S. at 225, 96 S.Ct. at 2538, in noting that "the Supreme Court has ruled that the due process clause does not in itself protect a convicted prisoner from transfer between jails in the state prison systems.").

 Long does not have even an arguable property or liberty interest in being classified in any way or in any particular type of medical treatment. Thus, placing Long in an "inappropriate" facility and denying his desired medical treatment without giving him the opportunity to be heard does not violate the Fourteenth Amendment. Long has not established that defendants violated his due process rights, and his request for relief as to this claim is denied.

### D. *Qualified Immunity*

 Qualified immunity shields government officials from liability for money damages when performing discretionary functions if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); see *Ricker v. Leapley,* 25 F.3d 1406, 1409 (8th Cir.1994); *Buzek v. County of Saunders,* 972 F.2d 992, 996 (8th Cir.1992) (quoting *Harlow* ); *Cross v. City of Des Moines,* 965 F.2d 629, 631 (8th Cir.1992) (quoting *Harlow* ).

 In determining whether defendants are entitled to qualified immunity, the court applies the following three-part test: (1)

whether the plaintiff asserted the violation of a constitutional right; (2) whether this constitutional right was clearly established at the time the incident occurred; and (3) whether a reasonable official would have known his actions violated that right. *See Foulks v. Cole County, Mo.,* 991 F.2d 454, 456 (8th Cir.1993); *see also Cleavinger v. Saxner,* 474 U.S. 193, 207, 106 S.Ct. 496, 503–04, 88 L.Ed.2d 507 (1985); *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738.

 Although the right to treatment for serious medical needs is well established, inmates have no constitutional right to a particular medical treatment or to be classified in a certain way. Defendants did not violate any of Long's clearly established constitutional rights of which a reasonable prison official would have known. They are entitled to qualified immunity on Long's claims for money damages.

### III. CONCLUSION

Because Long has failed to establish any constitutional violations by defendants, and defendants are entitled to qualified immunity from money damages,

IT IS ORDERED that judgment be entered in favor of the defendants.