Thomas L. WHITE, Appellee,

v.

Harold FARRIER; Crispus C. Nix, Appellants.

No. 87–2107.

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 26, 1988.

Decided June 13, 1988.

Lucille M. Hardy, Des Moines, Iowa, for appellants.

Anne Marie Herr, Clinical Law Program–Student, Iowa City, Iowa, for appellee.

Before BOWMAN, WOLLMAN, and MAGILL, Circuit Judges.

WOLLMAN, Circuit Judge.

Warden Crispus C. Nix and Director of Corrections Harold Farrier (prison officials) appeal from the district court's order granting summary judgment to Thomas L. White a/k/a Tammy Lynn White in his civil rights action under 42 U.S.C. § 1983. We agree with the prison officials that they raised genuine issues of material fact from which a jury might reasonably conclude that they were not deliberately indifferent to White's allegedly serious medical need, transsexualism. We reverse the district court's grant of summary judgment in favor of White and remand for further proceedings consistent with this opinion.

White is serving a ten-year sentence at the Iowa State Penitentiary at Fort Madison, Iowa, for armed robbery. In his original complaint, filed pro se, White alleged that he suffers from a mental disorder known as gender dysphoria or transsexualism and that prison officials were deliberately indifferent to his condition. Although anatomically male, White believes that he is a woman cruelly imprisoned in a man's body. White maintained that the only adequate treatment for transsexualism is radical sexual reassignment surgery. He requested electrolysis, cosmetic surgery, hormone therapy, a sex change operation, female clothes and cosmetics, and a transfer to a women's prison. After the court appointed the Prisoner Assistance Clinic, College of Law, University of Iowa, to represent White, he filed an amended complaint requesting a permanent injunction that would require prison officials to provide him adequate medical care and an appropriate classification to protect his right to existence in the feminine gender.

White had made various demands to prison officials prior to filing this action. In late 1983, White wrote Warden Nix a letter requesting female clothes. Warden Nix responded:

Female clothing is not permitted for inmate wear in this male facility. Though you may be mixed up as to what your sexual preference is, we will still treat you as a male. Some of the staff are baffled as to why you want perfume, cosmetics and women's clothing when you are wearing a mustache. A mustache does not accent your femininity.

Plaintiff's Exhibit No. 1 at 10.

White's request for female hormones was referred to Dr. Loeffelholz, a psychiatrist and medical consultant to the Iowa Department of Corrections. After reviewing White's records from a previous incarceration in the Iowa prison system, Dr. Loeffelholz advised White to behave in a manner to earn the earliest possible work release or parole so that he could "do his own thing" as a free citizen. Dr. Loeffelholz concluded that no medical or psychiatric condition existed that required any specific treatment from health professionals in the Department of Corrections. Designated Record at 69–70.

White later went on hunger strikes, threatened to commit suicide, and attempted to castrate himself on four different occasions, using a razor, a sharpened metal cup, glass from his smashed television set, and glass from his radio. In response, prison officials provided medical care for his physical injuries and placed him in pro-

tective custody or administrative confinement.

After White filed this section 1983 action, his attorneys arranged for four different experts to diagnose his condition. Dr. D.W. Black of the University of Iowa Psychiatry Department concluded that although White was possibly a transsexual, he was unable to make an unequivocal diagnosis because White's complete medical and psychiatric history was not available to him. The other three experts all diagnosed White as a transsexual. Karleatha Fisher, a social worker who works with transsexuals, interviewed White and concluded that he was mentally and emotionally totally female. She recommended that White receive hormone therapy in a medical environment. Dr. Howard J. Ruppel, a certified sexologist at the School of Social Work at the University of Iowa and Director of the Center for Sexual Growth and Development in Mt. Vernon, Iowa, diagnosed White as a transsexual and recommended that "Tammy" be placed in an environment where "she" could receive counseling from a professional who follows the Harry Benjamin International Gender Dysphoria Association standards of care. He also recommended that White be allowed to fully explore the ramifications of a permanent sex change, and to express "her" feminine self by wearing female apparel and makeup.

Dr. Collier Cole, a clinical psychologist and professor at the School of Allied Health Sciences and the Department of Psychiatry and Behavioral Sciences at the University of Texas Medical Branch, Galveston, interviewed White and reported that he saw no evidence of a major thought disorder such as schizophrenia that would preclude a diagnosis of transsexualism. In Dr. Cole's opinion, the prison had not provided White with the minimal standard of current and accepted treatment for his condition. He recommended that White be allowed to cross-dress, enter vocational rehabilitation to enable him to re-enter socie-

ty as a female, and eventually begin hormone therapy. He considered transsexualism to be a serious medical condition and noted that it is listed in the Diagnostic and Statistical Manual, Third Edition of the American Psychiatric Association (DSM–3), as a major mental disorder.[1]

Relying on the opinions of Dr. Cole, Dr. Ruppel, Dr. Black and Ms. Fisher, White filed a motion for summary judgment. The prison officials responded with a cross-motion for summary judgment. The magistrate concluded that the prison officials had been deliberately indifferent to White's serious medical need and recommended that the district court grant White's motion for summary judgment. The magistrate found that the prison officials' response to White's numerous castration attempts— placing him in lock up—was an arbitrary administrative decision and not treatment. The magistrate faulted the prison officials for not articulating a reason for not transferring White to a medical environment where White could receive counseling and "some understanding for his circumstances." Mem. op. at 20. Although the magistrate concluded that White does not have a right to preoperative hormone treatment and sex reassignment surgery while he is incarcerated, he recommended that an independent expert in the area of gender dysphoria diagnose White and determine a minimal treatment plan.

The district court accepted the magistrate's recommendations but ruled that a minimal treatment plan should not necessarily preclude hormone therapy. The court ordered that "if the diagnosis made by the independent expert establishes that plaintiff has a medical need in the nature of gender dysphoria, that defendants provide plaintiff with whatever minimal treatment plan the independent expert recommends, which may include hormonal therapy." Mem. op. at 3. On appeal, the prison officials argue that the district court erred in granting White's motion for summary

1. White was later evaluated by Dr. Keith Rogers, a psychiatrist at the Department of Correction Health Services. The parole board requested this evaluation to determine whether White should receive a preparole evaluation at Oakdale. Dr. Rogers diagnosed White as a transsexual.

judgment. They contend that White did not prove that he is a transsexual or that transsexualism is a serious medical need to which they were deliberately indifferent.

## I.

Summary judgment is appropriate only when there is no genuine issue as to any material fact and the case may be decided on purely legal grounds. Fed.R.Civ.P. 56(c); *AgriStor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir.1987). The substantive law of the case determines which facts are material or critical, and a dispute about a material fact is genuine if a reasonable jury could return a verdict in favor of either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A judge's function in ruling on a summary judgment motion is not to weigh the evidence but to determine whether a genuine issue exists that can be resolved only by the trier of fact at trial. *Id.* 106 S.Ct. at 2511; *see also Fields v. Gander*, 734 F.2d 1313, 1314-15 (8th Cir. 1984). The court must view the evidence in the light most favorable to the nonmoving party, giving him the benefit of all reasonable factual inferences. *Holloway v. Lockhart*, 813 F.2d 874, 878 (8th Cir.1987). The court must grant a defendant's motion for summary judgment when the plaintiff has failed to make a sufficient showing on an essential element of his case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

## II.

Prison officials' deliberate indifference to a prisoner's serious medical need constitutes cruel and unusual punishment in violation of the eighth amendment. *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976). Although the drafters of the eighth amendment were primarily concerned with proscribing torture and other barbarous methods of punishment, the Court has expanded the reach of the eighth amendment to parallel society's evolving standards of decency. *Id.* at 102, 97 S.Ct. at 290. Denial of medical care that results in unnecessary suffering in prison

is inconsistent with contemporary standards of decency and gives rise to a cause of action under 42 U.S.C. § 1983. *Id.* at 103-05, 97 S.Ct. at 290-92. Actions without a penological justification may constitute an unnecessary infliction of pain. *Jorden v. Farrier*, 788 F.2d 1347, 1348 (8th Cir.1986). Mere negligence in diagnosing or treating a medical condition, however, is not a constitutional violation simply because the patient is a prisoner. *Estelle v. Gamble*, 429 U.S. at 106, 97 S.Ct. at 292. Instead, prison officials must act with deliberate indifference to the prisoner's serious medical need.

### A. Serious Medical Need

■ The prison officials first contend that the record did not establish that transsexualism is a serious medical need. Although the American Psychiatric Association recognizes transsexualism as a psychosexual disorder, the prison officials note that some experts consider it to be a neurohormonal problem rather than a psychiatric problem. Experts also disagree on the proper treatment for transsexualism.

White correctly points out that psychological disorders may constitute a serious medical need. *See Meriwether v. Faulkner*, 821 F.2d 408, 413 (7th Cir.), *cert. denied*, — U.S. —, 108 S.Ct. 311, 98 L.Ed. 2d 269 (1987); *Young v. Armontrout*, 795 F.2d 55, 56 (8th Cir.1986). The Seventh Circuit has concluded that transsexualism should be treated the same as any other psychiatric disorder and that it does constitute a serious medical need. *Meriwether v. Faulkner*, 821 F.2d at 413. We have also recognized that transsexualism is a very complex medical and psychological problem. *Pinneke v. Preisser*, 623 F.2d 546, 549 (8th Cir.1980). We therefore conclude that transsexualism is a serious medical need.

■ The prison officials next contend that the record did not establish that White is a transsexual. The Merck Manual of Diagnosis and Therapy defines transsexualism as follows:

A transsexual believes that he is the victim of a biologic accident, cruelly im-

prisoned within a body incompatible with his real sexual identity. Most are men who consider themselves to have feminine gender identity and regard their genitalia and masculine features with repugnance. Their primary objective in seeking psychiatric help is not to obtain psychologic treatment but to secure surgery that will give them as close an approximation as possible to a female body. The diagnosis is made only if the disturbance has been continuous (not limited to periods of stress) for at least 2 [years], is not symptomatic of another mental disorder such as schizophrenia, and is not associated with genital ambiguity or genetic abnormality.

*Meriwether v. Faulkner*, 821 F.2d at 412 n. 5 (citing the Merck Manual of Diagnosis and Therapy 1434 (14th ed. 1982)).

The prison officials assert that the district court's order requiring them to hire an independent expert to determine whether White is a transsexual shows that a genuine issue exists about this crucial fact. Furthermore, they argue that in reaching the conclusion that White is a transsexual, the magistrate improperly weighed the credibility of witnesses and made findings of fact. We agree.

Although the experts who interviewed White at the request of his attorneys concluded that White is a transsexual, Dr. Loeffelholz' affidavit stated that an accurate diagnosis of transsexualism is precluded in a prison setting due to the stress of institutionalization. Additionally, White had not met the real-life test of living as a female continuously for several years. Dr. Loeffelholz also noted that White's history of manipulative behavior patterns suggested that White's actions were motivated by the potential for secondary gain. The magistrate rejected Dr. Loeffelholz' opinion because Dr. Loeffelholz had never interviewed White, instead basing his opinion solely on a review of White's records. In rejecting Dr. Loeffelholz' opinion, the magistrate made a credibility determination that is inappropriate in ruling on a motion for summary judgment.

Furthermore, the magistrate ignored evidence in the record concerning White's prior psychiatric history in the Iowa Department of Corrections. In 1980, during a prior incarceration, White spent three months at the Iowa Security Medical Facility in Oakdale, Iowa. There, Dr. R.T. Lara, a psychiatrist, diagnosed White as having an antisocial personality and the sexual deviation of transvestism. Unlike transsexuals, transvestites are comfortable with their sex; they cross-dress as females for sexual arousal rather than sexual comfort. Dr. Lara's report also indicated that in 1978, White had been diagnosed as a paranoid schizophrenic, which would preclude a diagnosis of transsexualism. White had stated that he could hear the voice of Satan telling him to kill. Additionally, White's medical history includes enuresis, suicidal threats, thefts of female clothes, money, and a horse tank, substance abuse, learning disabilities, and behavioral problems. Dr. Lara concluded that there was nothing more to offer White psychiatrically upon his discharge from the medical facility because of White's attitude of stubbornness and of having all the answers. We therefore conclude that Dr. Loeffelholz' opinion, which contradicted the opinion of White's experts, along with Dr. Lara's report on White's prior medical history, created a genuine issue of material fact as to whether White is a transsexual.

## B.  Deliberate Indifference

■ The prison officials next contend that the record did not establish that they were deliberately indifferent to White's need. White points to Dr. Loeffelholz' letter to White in response to his request for hormones, indicating that "no medical or psychiatric condition exists which requires any specific treatment from health professionals in the Department of Corrections," as an example of deliberate indifference. DR at 69. The prison officials maintain, however, that they cannot be held responsible for Dr. Loeffelholz' actions because *respondeat superior* does not apply to claims under 42 U.S.C. § 1983. They argue that transsexualism is not an obvious

medical need that a lay person could recognize as requiring medical attention.

■ A section 1983 action against supervisory officers cannot be based on the theory of respondeat superior. *Monell v. Department of Social Services*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978); *Graham v. Baughman*, 772 F.2d 441, 447 (8th Cir.1985). A supervisor will only be liable if he fails to train or control the subordinates who cause the plaintiff's injury. *Id.* Warden Nix and Iowa Department of Corrections Director Farrier supervise the provision of medical treatment at the prison, but they do not have the expertise to make an independent diagnosis of White's condition. The fact that Warden Nix had received memos and grievances from White demanding hormones and female clothes [2] does not in and of itself establish that he knew that White had a serious medical need. Warden Nix justifiably relied on the opinion of Dr. Loeffelholz that no medical need existed. The level of the prison officials' personal involvement in the medical staff's decision that no medical need existed is a question of fact to be determined at trial.

Moreover, the record does not establish that Dr. Loeffelholz was deliberately indifferent to White's needs. Although White's experts diagnosed White's condition differently than Dr. Loeffelholz did, this does not establish deliberate indifference. Physicians are entitled to exercise their medical judgment. *Noll v. Petrovsky*, 828 F.2d 461, 462 (8th Cir.1987) (per curiam), *cert. denied*, — U.S. —, 108 S.Ct. 718, 98 L.Ed.2d 668 (1988).

Additionally, the prison officials contend that legitimate security reasons dictate that cross-dressing and cosmetics not be allowed in a male prison. They argue that "the State has a legitimate interest in not having a male with female breasts in a male prison and in not placing persons with functional male genitals in a female pris-on." Brief of Appellant at 26–27. Thus, their actions do not constitute an arbitrary decision without a penological justification. *Cf. Jorden v. Farrier*, 788 F.2d at 1348.

The prison officials' final contention is that the district court misapplied the applicable law in ordering that a minimal treatment plan should not necessarily preclude hormone therapy. Courts that have addressed the issue have concluded that inmates do not have a constitutional right to hormone therapy. *See Supre v. Ricketts*, 792 F.2d 958, 963 (10th Cir.1986); *Meriwether v. Faulkner*, 821 F.2d at 413; *Lamb v. Maschner*, 633 F.Supp. 351, 353–54 (D.Kan.1986).

In *Meriwether*, prison officials denied hormone therapy to an inmate who had been chemically castrated through nine years of estrogen therapy prior to his incarceration. The Seventh Circuit recognized transsexualism as a serious medical need and held that a transsexual is entitled to some type of treatment. The court explicity held, however, that a prisoner has no constitutional right to estrogen, provided that some other treatment is made available to him. The court stated that federal courts must defer to the informed judgment of prison officials in deciding what treatment is appropriate. Similarly, in *Supre*, the plaintiff attempted to mutilate his sex organs and requested estrogen therapy. Prison officials denied his request for estrogen because of the dangers involved but provided him with psychological counseling. After a subsequent attempt at self-mutilation, doctors surgically removed his seriously injured testicles. The medical staff determined that testosterone replacement therapy and mental health treatment would be the appropriate treatment. The Tenth Circuit held that Supre did not have a constitutional right to estrogen therapy and that the prison officials had not ignored Supre's medical needs.

---

2. One such memo to Warden Nix stated:
   I cannot stand the emotional stress. The penis has to go now. I have a female gender identify [sic], genital mutilation may be the only key. I am tired of suffering. If you could only begin to understand the difficulties I have every day. I am sick of being this way. I can't take this any longer. I am a woman and women do not live like men. Women have vaginas and wear dresses.

Likewise in *Lamb*, the court held that the plaintiff had no constitutional right to be transferred to a female prison, cosmetics, female clothes, preoperative hormone treatment or a sex change operation. Although a dispute existed over whether Lamb was a transsexual, the court assumed that he was and asked whether the prison officials had provided Lamb some type of treatment, even if the treatment was not what Lamb requested. The court considered several factors in determining that no constitutional violation occurred. First, none of the psychiatrists or social workers who had examined Lamb recommended hormones or surgery, because many experts consider such treatment inadvisable in a prison setting. It also noted that Lamb had a history of nonconformity. Finally, the court reasoned that Lamb was receiving mental treatment because he was housed in the state hospital. Therefore, the court granted the defendant's motion for summary judgment.

In this case, the magistrate attempted to distinguish *Lamb* on the basis that there was no evidence that White was a nonconformist or that White was receiving any medical treatment for his condition. The prison officials contend that the magistrate erred by ignoring the evidence in the record that White was seeing Mr. Lode, the prison psychologist. Also, medical records indicated that White, like Lamb, had a history of nonconformity. Furthermore, unlike the facts in *Meriwether*, here there is a question as to whether White is a transsexual and whether any treatment is required.

Accordingly, the district court's grant of summary judgment in favor of White is reversed and the case is remanded for further proceedings consistent with this opinion.