Jessica E. WOLFE,

v.

Martin F. HORN, et al.

No. 97–CV–3114.

United States District Court,
E.D. Pennsylvania.

Jan. 29, 2001.

trine of forum non conveniens, having dismissed the case on grounds of international comity.

Susan R. Becker, Stephanie G. Colman, Ballard Spahr Andrews & Ingersoll, Philadelphia, PA, for plaintiff.

Beth Anne Smith, Office of Atty. Gen., Philadelphia, PA, Benjamin A. Post, Post

& Schell, P.C., Craig A. Stone, John F. Yanick, Mette, Evans and Woodside, Harrisburg, PA, Brigid Q. Alford, Boswell, Tintner Piccola & Wickersham, Harrisburg, PA, Alan S. Gold, Senn Robins, Monaghan & Gold, P.C., for defendants.

## MEMORANDUM AND ORDER

ANITA B. BRODY, District Judge.

In this action pursuant to 42 U.S.C. § 1983 and Pennsylvania law, Jessica E. Wolfe, a state prisoner, alleges: (1) deliberate indifference to her serious medical needs under the Eighth and Fourteenth Amendments to the United States Constitution, and Article I, Section 13 of the Pennsylvania Constitution, (2) violation of the Equal Protection Clause, and (3) medical malpractice. All of the defendants have moved for summary judgment.[1]

I will grant summary judgment in favor of all defendants on the equal protection claim, and dismiss the § 1983 damage claims against Martin F. Horn, Martin L. Dragovich and Kenneth D. Kyler on the basis of qualified immunity. I will deny summary judgment on the deliberate indifference and medical malpractice claims.

## I. FACTUAL BACKGROUND

Wolfe is a male-to-female pre-operative transsexual.[2] While retaining male genitalia, Wolfe suffers from a gender identity disorder that causes her to identify as a woman. Having experienced this disorder from a young age, Wolfe's medical history reflects depression, alcoholism and suicidal impulses.

In October 1994, Wolfe sought treatment at the Persad Center in Pittsburgh ("Persad"), which specializes in the treatment of transsexuals. In April 1995, Persad accepted Wolfe into a therapeutic program. In February 1996, following extensive psychotherapy, a Persad endocrinologist prescribed "Estrace" and "Lupron" hormones to suppress Wolfe's testosterone production and align her body more closely with her gender identity.[3] Prozac was prescribed for Wolfe's depression.

On March 13, 1996, Wolfe was arrested and detained at Allegheny County Jail. Wolfe continued to receive hormonal treatment in Allegheny County Jail. On July 29, 1996, after being sentenced to a minimum term of five years imprisonment, Wolfe was transferred to SCI–Pittsburgh. Wolfe continued to receive hormonal treatment at SCI–Pittsburg.

On August 6, 1996, Wolfe was transferred to SCI–Camp Hill, where she was examined by John Mitchell Hume, M.D. Wolfe explained to Hume that she suffered from transsexualism, that an endocrinologist had prescribed hormones for her, and that she continued to receive such hormones at Allegheny County Jail and at SCI–Pittsburgh. Hume told Wolfe that he would discontinue hormonal treatment. In Wolfe's medical chart, Hume noted that hormones posed risks to Wolfe because she smoked, was forty pounds overweight and had marginally elevated blood pressure. Nevertheless, Hume agreed to refer Wolfe to another psychiatrist for a "second opinion." On September 27, 1996, that psychiatrist promised to reinstate Wolfe's hormonal therapy. However, Hume refused to approve hormonal treatment because there was no indication of such a promise in the files. Hume prescribed psychotherapy, group therapy and Prozac. Hume did not offer to gradually taper-off

---

**1.** The remaining defendants are: (1) Martin F. Horn, (2) Martin L. Dragovich, (3) Kenneth D. Kyler, (4) John Mitchell Hume, M.D., (5) Louis Martin, M.D., (6) Martin L. Lasky, D.O., and (7) Peter Baddick, D.O.

**2.** On a motion for summary judgment, the facts are stated in the light most favorable to the plaintiff. I will refer to plaintiff using the pronouns "she" and "her."

**3.** By Decree dated March 5, 1996, Wolfe changed her legal name from "James Elliott Wolfe, Jr." to "Jessica Elaine Wolfe." (Civil Case No. GD 96–000935, Court of Common Pleas, Allegheny County).

the hormones, advise Wolfe that she would endure withdrawal symptoms, or monitor Wolfe's progress through withdrawal.

In late September 1996, after Wolfe had exhausted her last supply of Estrace, she suffered severe withdrawal symptoms, including headaches, nausea, vomiting, cramps, hot flashes, and hair loss. In addition, the hormonal effects on Wolfe's breast size, body hair and voice pitch dissipated. As Wolfe reacquired masculine physical features, she became depressed and suicidal. On October 15, 1996, Hume told Wolfe that she had "survived the withdrawal," and would no longer receive any hormones.

Martin L. Lasky, D.O., Medical Director of SCI–Camp Hill, affirmed Hume's decisions. After personally evaluating Wolfe when she arrived at SCI–Camp Hill, Lasky instructed a Physician's Assistant not to refill Wolfe's Estrace prescription. Subsequently, Wolfe appealed to Kyler, Superintendent of SCI–Camp Hill, and Horn, Secretary of the Pennsylvania Department of Corrections. Kyler and Horn declined to interfere with Hume and Lasky's medical decisions.

On November 19, 1996, Wolfe was transferred to SCI–Mahanoy, where she remains incarcerated to date. At SCI–Mahanoy, she was evaluated by Louis Martin, M.D. and Peter Baddick, D.O. Neither Martin nor Baddick provided hormonal therapy to Wolfe. Initially, Martin provided monthly counseling sessions and prescribed Prozac. On January 6, 1997, Baddick determined that he would prescribe "no treatment at present." In a meeting on April 2, 1997, Baddick reported that hormones would not be prescribed because surgery was unavailable, and hormones might expose Wolfe to risks of cancer and thrombophlebitis. Wolfe appealed to Dra-

govich, then-Superintendent of Mahanoy, who declined to intervene.[4]

## II. DISCUSSION

In this litigation, Wolfe does not seek a sex change operation, nor does she necessarily seek hormonal therapy or any particular cure. *See Madera v. Correctional Medical Systems*, 1990 WL 132382 * 3 (E.D.Pa.1990) (no "absolute" right to hormones). Rather, she seeks some form of therapy to alleviate her suffering from transsexualism while in prison. The defendants move for summary judgment on all of Wolfe's claims under 42 U.S.C. § 1983, the Pennsylvania Constitution, and Pennsylvania negligence standards.

Because analysis of the state-law claims may be facilitated by resolution of the Eighth and Fourteenth Amendment claims pursuant to § 1983, I begin with the elements of a § 1983 action: (1) the alleged misconduct was committed by a person acting under color of state law; and (2) the plaintiff was deprived of rights, privileges, or immunities secured by the Constitution or laws of the United States. *See West v. Atkins*, 487 U.S. 42, 48–57, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). The defendants do not dispute that they were acting under color of state law. *See id.* However, they seek summary judgment on the Eighth and Fourteenth Amendment claims, and raise a number of defenses to suit under § 1983.[5]

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Ca-*

---

4. Throughout her years of incarceration, Wolfe has been identified, housed and treated as a male prisoner. Her commitment name is "James." Accordingly, the defendants did not refer to Wolfe as "Jessica," and she has not been permitted to wear female undergarments, makeup, or long hair.

5. These defenses include: (1) qualified immunity, (2) statute of limitations, (3) issue preclusion, (4) lack of "physical injury," (5) attempt to impose "respondeat superior" liability, and (6) "good faith."

*trett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A court must determine "whether the evidence presents a sufficient [factual] disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). At the summary judgment stage, the Court must view the evidence, and draw all reasonable inferences, in the light most favorable to the non-moving party. *See Dici v. Com. of Pa.,* 91 F.3d 542, 547 (3d Cir.1996).

### A. *"Deliberate Indifference" Claims*

■ When prison officials are deliberately indifferent to an inmate's serious medical needs, they violate the Eighth Amendment's ban against "cruel and unusual punishments." *See Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). To establish this violation, two prongs must be met: (1) "deliberate indifference," (2) to a prisoner's "serious" medical needs. *See Monmouth County Correctional Institutional Inmates v. Lanzaro,* 834 F.2d 326, 346 (3d Cir.1987); *West v. Keve,* 571 F.2d 158, 161 (3d Cir.1978).[6] Negligent malpractice, standing alone, is not actionable under the Eighth Amendment. *See Estelle,* 429 U.S. at 105–06, 97 S.Ct. 285; *Durmer v. O'Carroll,* 991 F.2d 64, 67 (3d Cir.1993); *White v. Napoleon,* 897 F.2d 103, 110 (3d Cir.1990).

Courts have consistently considered transsexualism a "serious medical need" for purposes of the Eighth Amendment. *See Cuoco v. Moritsugu,* 222 F.3d 99, 106 (2d Cir.2000); *White v. Farrier,* 849 F.2d 322, 325 (8th Cir.1988); *Meriwether v. Faulkner,* 821 F.2d 408, 411–13 (7th Cir. 1987). Accordingly, the defendants focus their summary judgment motions on the "deliberate indifference" prong, rather than the "serious medical needs" prong.

When a prisoner has received medical attention and merely questions its adequacy, courts hesitate to second-guess professional judgments under the guise of the Eighth Amendment. *See Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 762 (3d Cir.1979); *United States ex rel. Walker v. Fayette County,* 599 F.2d 573, 575 n. 2 (3d Cir.1979). Prisoners are only entitled to "some" kind of medical attention. *See Farrier,* 849 F.2d at 327; *Meriwether,* 821 F.2d at 413. Thus, courts have rejected demands for hormonal therapy by transsexuals who did not take hormones outside of the prison setting. *See Maggert v. Hanks,* 131 F.3d 670 (7th Cir. 1997); *Long v. Nix,* 86 F.3d 761 (8th Cir. 1996); *Brown v. Zavaras,* 63 F.3d 967, 970 & n. 2 (10th Cir.1995); *Supre v. Ricketts,* 792 F.2d 958 (10th Cir.1986); *Farmer v. Carlson,* 685 F.Supp. 1335 (M.D.Pa.1988); *Lamb v. Maschner,* 633 F.Supp. 351 (D.Kan.1986).

The case is different when prison officials terminate medical treatment that was previously recommended and administered by a medical professional. In *Phillips v. Michigan Dep't. of Corrections,* 731 F.Supp. 792 (W.D.Mich.1990), *aff'd,* 932 F.2d 969, 1991 WL 76205 (6th Cir.1991), the plaintiff had taken hormones immediately before incarceration, and her therapy was initially continued in prison. Upon plaintiff's transfer to a different facility, her hormones were withdrawn by a prison doctor. Applying the "deliberate indifference" test, the court ordered prison officials to maintain preexisting hormonal levels, since withdrawal would "wreak havoc on plaintiff's physical and emotional state." *Id.* at 800–01. The court observed that "[t]aking measures which actually reverse the effects of years of healing medical treatment . . . is measurably worse [than not providing care in the first place], mak-

---

**6.** "Deliberate indifference" is essentially a subjective standard: "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw

the inference." *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). However, objective factors may inform the viability of a "deliberate indifference" claim.

ing the cruel and unusual determination much easier." *Id.* at 800.

Likewise, in *South v. Gomez,* 211 F.3d 1275, 2000 WL 222611 * 2 (9th Cir.2000), the court distinguished between failing to provide hormonal therapy in the first instance, and abruptly terminating an existing prescription. The court considered the latter context to be critically different and "far narrower." *Id.* The court also affirmed a preliminary injunction requiring the prison to continue plaintiff's hormone therapy, since a prison doctor had halted treatment without contacting the prescribing physician or consulting an expert. *See South v. Gomez,* 129 F.3d 127, 1997 WL 683661 (9th Cir.1997); *see also Saunders v. Horn,* 959 F.Supp. 689, 694 (E.D.Pa. 1996), *adopted,* 960 F.Supp. 893 (E.D.Pa. 1997) ("deliberate indifference" claim stated where prison official at SCI–Camp Hill confiscated orthopedic shoes prescribed by outside physician).

Similarly, in this case, Wolfe claims that hormonal therapy prescribed for her by a private endocrinologist, and continued by prison doctors at Allegheny County Jail and SCI–Pittsburg, was abruptly discontinued by prison officials who did not have expertise in transsexualism or consult any specialists. Additionally, Wolfe disputes that she has received any treatment for transsexualism at SCI–Camp Hill or Mahanoy. She claims, for example, that the Prozac prescribed for her depression was not treatment for transsexualism. Furthermore, Wolfe produces expert opinions stating that she received no therapy specifically treating her gender identity disorder. (Plaintiff's Ex. B, at 19).[7]

Accordingly, while Wolfe may have received some medical attention in prison, there is a fact question as to whether Wolfe received any treatment for transsexualism. *See Durmer v. O'Carroll,* 991 F.2d 64, 67–69 (3d Cir.1993) (reversing summary judgment for prison doctor who had provided "some treatment," where evidence was both consistent and inconsistent with deliberate indifference to medical condition); *West v. Keve,* 571 F.2d 158, 162 & n. 6 (3d Cir.1978) (finding material fact issue where prison denied recommended post-operative treatment, and opted for "easier and less efficacious treatment" of aspirin); *see also Meriwether v. Faulkner,* 821 F.2d 408, 413 (7th Cir.1987) (reversing dismissal of complaint, where prison withdrew hormones from plaintiff who alleged denial of all treatment for transsexualism).

Moreover, abrupt termination of prescribed hormonal treatments by a prison official with no understanding of Wolfe's condition, and failure to treat her severe withdrawal symptoms or after-effects, could constitute "deliberate indifference." *See Farmer v. Brennan,* 511 U.S. 825, 842, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("deliberate indifference" is fact question which may be demonstrated through circumstantial evidence that risks were obvious); *Young v. Quinlan,* 960 F.2d 351, 359–60 n. 21 (3d Cir.1992) (presence of deliberately indifferent state-of-mind unlikely to be resolved at summary judgment stage).[8]

■ Viewing the evidence in the light most favorable to Wolfe, there is at least a fact question as to whether each of the defendants was deliberately indifferent to treating Wolfe's gender identity disorder. Accordingly, the Eighth Amendment claim will proceed to trial.[9]

---

7. *See also* Def. Hume's Motion for Summary Judgment, Ex. 16, at 42–43 (treatment plan consisted of: (a) obtaining records, (b) continuing Prozac for depression, (c) providing psychotherapy to assist with prison "issues," and (d) recommending group therapy for anger, aggression and substance abuse problems).

8. Although the defendants argue that they acted through informed medical judgment, a jury could consider the medically-based justifications to be "merely a pretext." *Durmer,* 991 F.2d at 68; *Phillips,* 731 F.Supp. at 797–98 (Eighth Amendment claim likely to succeed, even though doctor stated concern about hormonal side effects on smoker).

9. The "deliberate indifference" test of the

## B. *"Equal Protection" Claim*

The Equal Protection Clause of the Fourteenth Amendment requires all persons "similarly situated" to be treated alike by state actors. *See City of Cleburne, Texas v. Cleburne Living Center,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Therefore, Wolfe must show that she was similarly situated to, and treated differently from, other inmates. *See Tillman v. Lebanon County Correctional Facility,* 221 F.3d 410, 424 (3d Cir.2000); *Keenan v. City of Philadelphia,* 983 F.2d 459, 465 (3d Cir.1992); *Andrews v. City of Philadelphia,* 895 F.2d 1469, 1478 (3d Cir.1990).

Wolfe bases her equal protection claim on her status as a transsexual. She alleges that the defendants were unwilling to take transsexualism "seriously," and failed to provide even basic treatment. (Plaintiff's Consolidated Memorandum of Law, at 29). Wolfe seems to imply that transsexual inmates at SCI–Camp Hill and Mahanoy do not receive the same medical treatment that other inmates receive. However, Wolfe presents no evidence of other inmates who have been treated differently in like circumstances. She points to no evidence that the medical conditions of other inmates at SCI–Camp Hill or Mahanoy were taken "seriously" or adequately treated. Nor does Wolfe know of other inmates who have received the medical treatment she seeks. (Deposition of Jessica E. Wolfe, at 106). Wolfe simply repeats her "deliberate indifference" allegations under the cloak of equal protection. *See Brown v. Borough of Mahaffey,* 35 F.3d 846, 850 (3d Cir.1994) (to assert equal protection violation as an independent constitutional claim, plaintiffs must prove that they received different treatment from other similarly situated persons).

■ Wolfe also alleges that Kyler, Dragovich and Horn implemented policies that limit treatment options for transsexuals, in that they did not call her "Jessica," or allow her to wear makeup or cross-dress. However, Wolfe fails to establish that other inmates with serious medical needs have received more appropriate treatment. Wolfe also produces no evidence that she received differential treatment insofar as prison officials called her by her commitment name.[10] Wolfe knows of no inmates at the all-male facilities of SCI–Camp Hill or Mahanoy who have been permitted to wear makeup or cross-dress. (Deposition of Jessica E. Wolfe, at 107). These equal protection allegations are simply unsupported. *See Brown v. Zavaras,* 63 F.3d 967, 970–72 (10th Cir.1995) (even assuming other prisoners received female hormones, plaintiff's equal protection allegations were conclusory and did not state factual basis).

Finally, Wolfe suggests as a basis for her equal protection claim that she was not allowed long hair, even though inmates are allowed long hair for *bona fide* religious reasons. Wolfe contends that long hair would serve a therapeutic purpose for her gender identity disorder. Yet, it is far from clear that such a therapeutic purpose would render Wolfe "similarly situated" to inmates with a sincere religious objection to the hair-length rule. Whether Wolfe

---

Eighth Amendment is applicable to claims under Article I, Section 13 of the Pennsylvania Constitution. *See Jochen v. Horn,* 727 A.2d 645, 649 (1999); *Inmates of B–Block v. Jeffes,* 79 Pa.Cmwlth. 275, 278–79, 470 A.2d 176, 178–79 (1983), *aff'd on other grounds,* 504 Pa. 509, 475 A.2d 743 (1984). Therefore, the Pennsylvania Constitutional claim will proceed against the medical defendants. Wolfe has voluntarily dismissed this claim against Horn, Dragovich and Kyler.

**10.** It is undisputed that prison officials called Wolfe by her commitment name, "James," except under limited circumstances. While this may have hampered the delivery of mail addressed to "Jessica" for a brief interval, no such allegation appears in Wolfe's complaint. In any event, whatever constitutional provisions might apply to such an allegation, "equal protection" cannot be one of them without evidence of differential treatment. *See Saunders v. Horn,* 959 F.Supp. 689, 696 (E.D.Pa.1996), *adopted,* 960 F.Supp. 893 (E.D.Pa.1997).

presents sufficiently like circumstances to meet the "similarly situated" threshold is questionable.

Nevertheless, summary judgment remains appropriate if there is a distinction between Wolfe and religious objectors that is "reasonably grounded in legitimate penological concerns." *DeHart v. Horn*, 227 F.3d 47, 61 (3d Cir.2000) (*en banc*) (citing *Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)). In *DeHart*, the Third Circuit considered a Buddhist prisoner's equal protection challenge to the dietary accommodation of Orthodox Jewish inmates. Because neither the defendants nor the district court had explained the penological interest in distinguishing between two religions, nor was a penological distinction "self-evident," the Third Circuit remanded for an explanation. *Id.* at 61.

In this case, there is a penological distinction between gender- and religiously-based requests for long hair that is more "readily apparent" than a dietary distinction between "a sincere orthodox believer" and "a sincere non-orthodox one." *Id.* n. 11. Distinguishing her situation from religious objection to haircuts, Wolfe wants long hair to address "gender issues" and express her "identity" as a woman. (*See* Commonwealth Ex. 6, at 8; attached Exs. S, T). The defendants have each raised security concerns with Wolfe's becoming "feminized" in an all-male prison. (*See, e.g.,* Commonwealth Defendants' Memorandum of Law, at 21–22). Indeed, as Wolfe recognizes in her Second Amended Complaint, there is a legitimate penological interest in protecting inmates from other inmates and maintaining prison order. Specifically, Wolfe notes that "grow[ing] her hair in accordance with Department of Corrections guidelines for female inmates" may not be deemed possible "without threat to her safety or [ ] disruption of control of the remaining inmate popula-

tion." (Sec. Am. Cmplt. at 18, ¶ 3) (observing potential for "undue disruption to prison procedures").

▉  Unlike the stated purpose and foreseeable effect of Wolfe's request for long hair in a male prison, religious opposition to haircuts is not designed to express a feminine gender identity, and does not invite similar threats to prison security. Wolfe herself recognizes the potential for institutional disruption and violence in allowing her to grow long hair in a male prison. "There is nothing in the Constitution which requires prison officials to treat all inmate groups alike where differentiation is necessary to avoid an imminent threat of institutional disruption or violence." *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 136, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977).

Summary judgment on the equal protection claims will be granted.

### C.  *Qualified Immunity*

A number of the defendants assert qualified immunity as a basis for summary judgment on Wolfe's § 1983 claims. Qualified immunity shields government officials from civil damages if their conduct did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).[11] For a plaintiff to overcome qualified immunity, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *see also Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) (immunity recognized "if offi-

---

11.  Qualified immunity does not bar injunctive relief. At the motion to dismiss stage, the claims for injunctive relief against Kyler, Lasky and Hume were dismissed as moot. Because Dragovich, Martin and Baddick have left SCI–Mahanoy, the claims for injunctive relief against them will also be dismissed as moot. The claim for injunctive relief against Horn remains.

cers of reasonable competence could disagree").

█ Under the current state of the law, private individuals who contract with the state to provide prison services do not appear entitled to qualified immunity under § 1983. *See Richardson v. McKnight,* 521 U.S. 399, 117 S.Ct. 2100, 138 L.Ed.2d 540 (1997) (private prison guards not entitled to qualified immunity); *Jordan v. Fox, Rothschild, O'Brien & Frankel,* 20 F.3d 1250, 1276 (3d Cir.1994) (citing *Wyatt v. Cole,* 504 U.S. 158, 112 S.Ct. 1827, 118 L.Ed.2d 504 (1992)) (private persons acting under color of law cannot assert qualified immunity); *Pearson v. City of Philadelphia,* 1998 WL 721076 * 3 (E.D.Pa.1998) (qualified immunity for private prison doctor is "questionable"). Since the medical defendants contracted with the state as private individuals, only Kyler, Dragovich and Horn are eligible for qualified immunity.

In undertaking the qualified immunity analysis for Kyler, Dragovich and Horn, I must determine whether these officials knew or should have known that their actions violated clearly established law, given the information they possessed. *See Hunter v. Bryant,* 502 U.S. 224, 227–28, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (qualified immunity analysis considers what reasonable officer could have believed in light of clearly established law and information officer possessed); *Gruenke v. Seip,* 225 F.3d 290, 298–300 (3d Cir.2000) (qualified immunity depends, not only on the law, but on what reasonable official would know under like circumstances).

█ Where a prison official is accused of failing to intervene in a medical decision, summary judgment is appropriate if the official did not possess information that would alert a reasonable person in his situation to a constitutional violation. *See Cuoco v. Moritsugu,* 222 F.3d 99, 110–12 (2d Cir.2000) (objectively reasonable for Warden, Health Services Administrator and prison psychologist, each of whom lacked medical degree, to disregard request for hormones in the face of withdrawal symptoms); *Rouse v. Plantier,* 182 F.3d 192, 199–201 (3d Cir.1999) (remanding for consideration of whether lay prison administrator, as opposed to medical professionals, should have discerned Eighth Amendment violation); *Durmer v. O'Carroll,* 991 F.2d 64, 69 (3d Cir.1993) (summary judgment properly granted to prison administrators who ignored medical complaints, as plaintiff "was already being treated by the prison doctor"); *Saunders v. Horn,* 960 F.Supp. 893, 896 (E.D.Pa. 1997) ("high-level officials cannot be held liable for Eighth Amendment violations when the officials rely on expertise of professional staff that they themselves lack").

█ Kyler, Dragovich and Horn are lay prison administrators, not professional medical providers. Although they were required to know that Wolfe was entitled to "some" treatment for transsexualism, these defendants reasonably could have believed that Wolfe was receiving such treatment. It is undisputed that Wolfe discussed her transsexualism with several medical professionals, received psychological counseling, and took prescription drugs. The medical professionals themselves claimed to provide treatment for Wolfe's transsexualism. In these circumstances, it was objectively reasonable for Kyler, Dragovich and Horn to rely on the medical professionals. (*See, e.g.,* Commonwealth Defendants' Motion for Summary Judgment, Ex. 4, at ¶¶ 2–4; Ex. 6, at ¶¶ 4–7 & 9–10).[12] Accordingly, Kyler, Dragovich and Horn are entitled to qualified

---

12. Even if they were mistaken as to whether Wolfe was receiving treatment for transsexualism, Kyler, Dragovich and Horn would be entitled to qualified immunity under these circumstances. *See Hunter,* 502 U.S. at 228–29, 112 S.Ct. 534 (qualified immunity provides "ample room for mistaken judgments"); *Malley,* 475 U.S. at 341, 106 S.Ct. 1092 (qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law").

immunity on Wolfe's § 1983 damage claims.[13]

### D. *Statute of Limitations*

■ Hume and Lasky alternatively move for summary judgment on the basis of the statute of limitations. The limitations period applicable to a § 1983 action is the limitations period for personal injury actions under state law. *See Wilson v. Garcia,* 471 U.S. 261, 276–80, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985). The statute of limitations for personal injury actions in Pennsylvania is two years. *See* 42 Pa. C.S.A. § 5524; *see also Smith v. Holtz,* 87 F.3d 108, 111 & n. 2 (3d Cir.1996); *Centifanti v. Nix,* 865 F.2d 1422, 1432–33 (3d Cir.1989); *Botton v. Marple Tp.,* 689 F.Supp. 477, 480 (E.D.Pa.1988).

A claim arising under Pennsylvania law accrues at "the occurrence of the final significant event necessary to make the claim suable." *Barnes v. American Tobacco Co.,* 161 F.3d 127, 136, 152 (3d Cir. 1998); *Ross v. Johns–Manville Corp.,* 766 F.2d 823, 826 (3d Cir.1985). Accrual is not triggered merely because "causes are set in motion which ultimately produce injury as a consequence." *Mack Trucks, Inc. v. Bendix–Westinghouse Automotive Air Brake Co.,* 372 F.2d 18, 21 (3d Cir.1966) (citation omitted).

■ There is a fact question as to whether the action against Hume and Lasky is time-barred. Wolfe filed this action on October 15, 1998. Although Wolfe was told, prior to October 15, 1996, that she would not receive hormones, there is evidence that this decision was not final. Among other things, Hume told Wolfe that he needed medical records from Persad to render a final decision about Wolfe's treatment plan. (Plaintiff's Ex. A, ¶ 14). Wolfe had reason to believe her medical records had not arrived by October 15, 1996. (Plaintiff's Ex. A, ¶¶ 15–18, 21; Exs. M, P, R, S). Because there is evidence to

suggest that Wolfe did not know, and should not have known, that a final decision violating her right to medical treatment had occurred by October 15, 1996, summary judgment on statute of limitations grounds will be denied.

### E. *Issue Preclusion*

■ Hume and Martin alternatively move for summary judgment on the basis of issue preclusion. Under federal law, a party will be estopped from relitigating an issue when: (1) the issue sought to be precluded is the same as the one involved in the prior action; (2) the issue was actually litigated; (3) the issue was determined by a valid and final judgment; and (4) the issue was essential to the prior judgment. *See In re Docteroff,* 133 F.3d 210, 214 (3d Cir.1997); *Burlington Northern R. Co. v. Hyundai Merchant Marine Co., Ltd.,* 63 F.3d 1227, 1231–32 (3d Cir.1995); *see also Hawksbill Sea Turtle v. Federal Emergency Management Agency,* 126 F.3d 461, 474–75 (3d Cir.1997).

■ The first action Hume and Martin seek to employ as a basis for issue preclusion is *James a/k/a Jessica Wolfe v. Zwierzyna, et al.,* Civil No. 3:CV–96–2046 (M.D.Pa.1996) (Kosik, J.). In that *pro se* suit for injunctive relief, the court noted that Wolfe had been transferred to SCI–Mahanoy, which is located within the confines of the United States District Court for the Eastern District of Pennsylvania. Because the case had been filed in the Middle District of Pennsylvania, the court dismissed the complaint "without prejudice," as moot. Clearly, this cannot satisfy the elements of issue preclusion.

The second action Hume and Martin seek to employ as a basis for issue preclusion is *Jessica E. Wolfe v. Commonwealth of Pennsylvania, et al.,* Civil Action No. 98–1132 (W.D.Pa.1998) (Lee, J.; Caiazza, M.J.), *aff'd,* No. 99–3392 (3d Cir.1999). In that *pro se* case, while the complaint men-

---

**13.** In view of this disposition, I need not reach Kyler's claim that Wolfe failed to exhaust her administrative remedies at SCI–Camp Hill.

tioned deliberate indifference to Wolfe's medical needs, the basis for the claim was failure to train employees or adopt policies protecting transsexuals at Allegheny County Jail, and/or to house Wolfe in a state hospital. Among other findings, which are not relevant to this case, the court concluded: (1) Wolfe did not have a constitutional right to a sex change, (2) Wolfe did not have a constitutional right to serve her sentence in a state hospital, as opposed to an all-male correctional institution, and (3) the Constitution does not recognize preoperative transsexuals as a protected class. *See* Def. Hume's Motion for Summary Judgment, Ex. 14, at 16–21 (quoting *Maggert v. Hanks,* 131 F.3d 670 (7th Cir.1997)).

■ In the present case, Wolfe is not seeking a sex change, nor does she ask to serve her sentence in a state hospital. Because there is no identity of the first and second issues, they cannot serve as a bar here. Given the disposition of Wolfe's equal protection claim, I need not decide whether Wolfe is precluded from arguing that transsexuals are a constitutionally protected class. The motions for summary judgment on the basis of issue preclusion will be denied.[14]

### F. *Physical Injury*

Hume, Martin and Baddick alternatively move for summary judgment, claiming that Wolfe has failed to produce evidence of a "physical injury." Under 42 U.S.C. § 1997e(e), no federal civil action may be brought by a prisoner "for mental or emotional injury suffered while in custody without a prior showing of physical injury."

■ However, Wolfe states that after her hormones were withdrawn, she suffered headaches, nausea, vomiting, cramps, hot flashes, and hair loss. Wolfe also complains of reduced breast size, increased body hair, and lowered voice pitch. With the re-emergence of masculine physical characteristics, Wolfe became depressed and suicidal. Thus, the alleged constitutional violations caused direct physical injuries, with attendant emotional consequences.[15] The motions for summary judgment based on the "physical injury" requirement will be denied.

### G. *Respondeat Superior*

■ Baddick alternatively moves for summary judgment, claiming that Wolfe seeks to hold him liable on a *respondeat superior* theory. It is well settled that *respondeat superior* is not a basis for imposing liability under § 1983. *See Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1294 (3d Cir.1997). However, liability will attach when there is evidence of "personal direction" or "actual knowledge and acquiescence." *Andrews v. City of Philadelphia,* 895 F.2d 1469, 1478 (3d Cir.1990); *Rode v. Dellarciprete,* 845 F.2d 1195, 1207 (3d Cir.1988).

Baddick was not merely the Medical Director of SCI–Mahanoy, but: (1) personally evaluated Wolfe, (2) determined what treatment was appropriate, and (3) reported to Wolfe that she would not receive hormonal therapy. This constitutes sufficient participation for § 1983 purposes, and Baddick's motion for summary judgment on this basis will be denied.

---

**14.** There may be several additional reasons not to apply the issue preclusion doctrine. For example, the issue of withdrawn hormonal therapy did not arise at Allegheny County Jail and was not actually litigated in the Western District action, but rather arose at SCI–Camp Hill and Mahanoy, within the jurisdictions of the Middle and Eastern Districts of Pennsylvania.

**15.** *Compare McGrath v. Johnson,* 67 F.Supp.2d 499, 508 (E.D.Pa.1999) (constitutional violation caused emotional trauma, which manifested in inflamed preexisting skin condition); *Cain v. Com. of Va.,* 982 F.Supp. 1132, 1135 & n. 3 (E.D.Va.1997) (court disbelieved plaintiff's latest allegations of headaches, vision-loss, numbness and joint pains, "in light of his prior testimony and litigation").

## H. Good–Faith Defense

Baddick alternatively moves for summary judgment by asserting a "good-faith" defense. In *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1275–78 (3d Cir.1994), the Third Circuit held that private individuals invoking state attachment laws, which are subsequently found to be unconstitutional, could raise an affirmative defense of "good faith." However, assuming the "good-faith" defense applies in this context, the defendants' subjective state of mind cannot be evaluated without weighing the evidence and determining credibility. *See Egervary v. Rooney*, 2000 WL 1160720 * 6 (E.D.Pa.2000) (reserving judgment on "good faith" defense until jury trial); *Pearson v. City of Philadelphia*, 1998 WL 721076 * 2 (E.D.Pa.1998) (doubting applicability of "good faith" defense, but leaving issue for the jury).

Without deciding whether or not a "good faith" defense is applicable to this case, Baddick's motion for summary judgment on this basis will be denied.

## I. Medical Malpractice

■■■ Hume and Martin move for summary judgment on the medical malpractice claim, arguing that there is no material fact question as to whether they could be found liable for "willful misconduct" or "gross negligence." *See* 50 P.S. § 7114(a) (absent "willful misconduct" or "gross negligence," psychiatrists immune from liability for treatment of mentally ill). However, because there is a triable fact issue concerning "deliberate indifference" to serious medical needs, there is also a fact question concerning negligent malpractice under Pennsylvania law.[16]

■■■ Lasky and Baddick move for summary judgment on the malpractice count, claiming that Wolfe's experts did not suggest a violation of the applicable standard of care, and did not state their opinions to a "reasonable degree of medical certainty." Under Pennsylvania law, a medical malpractice plaintiff must introduce expert testimony that the disputed treatment fell below the applicable standard of care. *See Brannan v. Lankenau Hospital*, 490 Pa. 588, 595, 417 A.2d 196, 199 (1980); *see also Doby v. DeCrescenzo*, 171 F.3d 858, 876 (3d Cir.1999). Such expert testimony must be rendered within a "reasonable degree of medical certainty." *Mitzelfelt v. Kamrin*, 526 Pa. 54, 62, 584 A.2d 888, 892 (1990). However, experts are not required to use "the magic words," so long as the substance of their testimony, when taken as a whole, meets these requirements. *Id.* at 66–67, 894.

When read as a whole, the expert reports Wolfe submits are competent evidence, sufficient to create a factual question as to whether Lasky and Baddick were negligent. Accordingly, I will deny the motions for summary judgment concerning the medical malpractice claims.

An appropriate order follows.

### ORDER

**AND NOW**, this day of January 2001, it is hereby **ORDERED** that:

(1) The claims for injunctive relief against Dragovich, Martin and Baddick are **DISMISSED AS MOOT**.

(2) The consolidated motion for summary judgment of defendants Martin F. Horn, Martin L. Dragovich, and Kenneth D. Kyler (Docket Entry # 97) is **GRANTED IN PART** and **DENIED IN PART**. The equal protection claim is dismissed on the merits; the "deliberate indifference" claim for damages under the Eighth and Fourteenth Amendments is dismissed on

---

**16.** Of course, it may very well be that the defendants were neither deliberately indifferent nor negligent. *See Standards of Care: The Hormonal and Surgical Sex Reassignment of Gender Dysphoric Persons*, Harry Benjamin International Gender Dysphoria Associa-tion, Inc. 642, 646 (1990) (administration of hormones to males may lead to health-threatening complications, and sex reassignment applicants often underestimate risks). The expert reports submitted by the defendants supply evidence that they were not negligent.

the basis of qualified immunity. To the extent that the "deliberate indifference" claim seeks injunctive relief against Horn, the motion for summary judgment is denied.

(3) The motions for summary judgment of defendants John Mitchell Hume, M.D. (Docket Entry # 94), Louis Martin, M.D. (filed as Docket Entry # 31 to 98–CV–5474), Martin L. Lasky, D.O. (Docket Entry # 95), and Peter Baddick, D.O. (Docket Entry # 99) are **GRANTED IN PART** and **DENIED IN PART**. The equal protection claims are dismissed on the merits. The motions for summary judgment seeking dismissal of the "deliberate indifference" and medical malpractice claims are denied.